## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action:**

ROCKY MOUNTAIN PEACE & JUSTICE CENTER; CANDELAS GLOWS/ROCKY FLATS
GLOWS; ROCKY FLATS RIGHT TO KNOW; ROCKY FLATS NEIGHBORHOOD
ASSOCIATION; and ENVIRONMENTAL INFORMATION NETWORK (EIN) INC.,

    Plaintiffs,

  v.

UNITED STATES FISH AND WILDLIFE SERVICE;
GREG SHEEHAN, in his official capacity as Acting Director of the United States Fish and
Wildlife Service;
RYAN ZINKE, in his official capacity as Secretary of the Interior; and
DAVID LUCAS, in his official capacity as Project Leader, Region 6 of the United States Fish
and Wildlife Service;

and

UNITED STATES FEDERAL HIGHWAY ADMININSTRATION;
BRANDYE HENDRICKSON, in her official capacity as Acting Administrator of the United
States Federal Highway Administration; and
ELAINE L. CHAO, in her official capacity as Secretary of Transportation,

    Defendants.

_____

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
_____

### INTRODUCTION

Plaintiffs seek a Court order vacating the March 23, 2018 decision by Defendant U.S.

FISH AND WILDLIFE SERVICE ("USFWS") to construct hiking, biking and equestrian trails

(the "Public Trails") at the Rocky Flats National Wildlife Refuge (the "Refuge"), on lands that

were contained in the former Rocky Flats nuclear facility, and to allow 15 separate access points

into the Refuge for unlimited public access in the Summer of 2018.  Ironically, the USFWS

decision comes in the face of growing public concern about opening the Refuge to unlimited

access and six local school districts have now banned field trips to the Refuge should it be opened.[1]

This current action is timely, appropriate and brought as a last resort after this Court dismissed without prejudice Plaintiffs' previous case last summer as unripe to give USFWS an opportunity to make a final decision "after conducting the required compliance reviews" in compliance with the National Environmental Policy Act ("NEPA"). *Rocky Mnt. Peace & Justice Center v. U.S Fish and Wildlife Service,* No. CV 17-01210-CMA, 2017 WL 4844641 at *6 (D. Colo. Sept. 29, 2017). USFWS has conducted no environmental assessment (EA) or environmental impact statement (EIS) addressing the most important health and safety aspect of its plans – its decision to construct the Public Trails on Refuge lands that contain plutonium that has never been remediated. *See* 40 CFR § 1502.2 (requiring a discussion of all significant impacts). *See also* **Figure 1** (the proposed Greenway Trail (black line) drawn on U.S. Department of Energy (DOE) map of sampled, unremediated plutonium on the Refuge). DOE's original map is reproduced as **Exhibit 1**.

---

[1] The school districts are:

- Boulder Valley School District - board resolution 3/14/17
- St. Vrain Valley School District - commitment by the superintendent 5/10/17
- Westminster Public Schools - commitment by the superintendent 9/29/17
- Adams 14 School District - board resolution 10/10/17
- Adams 12 School District - commitment by the superintendent  12/6/17
- Jeffco Public Schools - commitment by the superintendent  2/8/18
- Denver Public Schools - board resolution 4/26/18



**Figure 1**

Plaintiffs do not suggest that no environmental impact statement (EIS) has ever been prepared for the Refuge.  In fact, Defendant USFWS finalized a joint "comprehensive conservation plan" and EIS in September 2004 (the "2004 CCP/EIS").  Strikingly, the 2004 CCP/EIS specified that the cleanup of the Refuge is "outside the scope of this EIS" because USFWS assumed it would receive a "cleaned-up site."[2]  But USFWS did not apply a standard definition of "cleaned-up."  Rather, it was "cleaned-up" pursuant to a plutonium cleanup standard

---

[2] The 2004 CCP/EIS "does not analyze different scenarios for the clean up activities because they are outside the scope of Refuge management activities.  A cleaned-up site provides the baseline for analysis." (p. 13).

that was higher than any other nuclear site in the country in the first 3 feet below ground, and allowed "unlimited" levels of plutonium 6 feet or more below ground, where much of the plutonium contaminated building debris, indeed entire basement stories of buildings with rooms that exceeded Geiger counter measurement levels (known as "infinity rooms"), were buried.[3]  By making the preposterous assumption that land in the buffer zone of the old nuclear facility was transferred to USFWS in "clean" condition, even though it underwent *no* remediation,[4] USFWS evaded its obligations under NEPA to look at alternatives to, and the environmental consequences of, placing trails where residual plutonium contamination lingers.  To this day, the assumption that the lands USFWS received from USDOE were as "clean" as pristine soil has guided all subsequent USFWS actions, including its failure to consider *any* risk to adults, children and seniors from their use of the Public Trails.  NEPA demands more rigor.  It requires information of "high quality" and "[a]ccurate scientific analysis," not dangerously fictitious assumptions.

---

[3] Rocky Flats Clean-up standard:   top 3 feet:  50 pC/gm; 3 to 6 feet:  1,000 – 7,000/gm; below 6 feet: unlimited.  By comparison, background level from global fallout (Front Range) = 0.04 pC/gm; Bomb site at Enewatak Atoll in the Pacific Ocean = 40 pC/gm; Bomb site at Johnston Atoll in the Pacific Ocean: 14 pC/gm; Livermore National Lab (California): 10 pC/gm; Fort Dix (New Jersey): 8 pC/gm; Hanford, Washington site: 34 pC/gm.   Iversen, Kristen, *Full Body Burden*; Moore, LeRoy, "Rocky Flats: The Bait-and-Switch Cleanup," *Bulletin of Atomic Scientists* (January/February 2005): 53.

[4] The Colorado Department of Public Health and Environment (CDPHE) and Defendant USFWS acknowledge that soils in the Refuge were never remediated.  *See, e.g.,* CDPHE, "What are the risks to a Rocky Flats National Wildlife Refuge Visitor," https://www.colorado.gov/pacific/cdphe/rocky-flats-risks-to-refuge-visitor ("Because of these very low concentrations, no remediation was required in the refuge portion of the site.").; Corrective Action Decision/Record of Decision for Rocky Flats Plant (USDOE), Peripheral Operable Unit…, Sept. 2006 ("No ECOCs were identified in the CRA for the Peripheral OU.  Therefore, the RI concluded that no action is required in the Peripheral OU and the Peripheral OU is determined to be acceptable for all uses.").

Reliance by USFWS on the 2004 EIS is also prohibited because an EIS generally becomes "stale" after five years, 46 Fed.Reg. 18026 (March 23, 1981) and even if it does not, NEPA requires "supplements to [the EIS]" if: (i) "the agency makes substantial changes" in the proposed action or if (ii) there are "significant new circumstances or information."  40 CFR § 1502.9(c)(i)-(ii).  The agency's March 23, 2018 decision contains significant and substantial changes, circumstances and new information since the 2004 CCP/EIS was prepared.

For instance, USFWS decided to place a portion of the primary Public Trail on a 600-plus acre parcel of land on the southwest corner of the Rocky Flats site (the "Section 16 Parcel") which was obtained by the federal government in 2012 *after* the 2004 CCP/EIS.  The Section 16 Parcel was neither sampled for plutonium or other contaminants of concern although the property was located just across the fence from the old Superfund site boundary.

Since 2004, there has also been (i) substantial erosion of features on the Refuge caused by destructive precipitation events in 2013 and 2015, (ii) a buildup of new residential neighborhoods and a public school directly bordering the Refuge to the south, (iii) studies showing that plutonium has migrated from the Refuge to offsite locations, and (iv) reports prepared by Metropolitan State University and others indicating higher than expected cancer rates among neighbors.

Additional significant changes made in the plans for the Public Trail project to be constructed on the Refuge include expansion of the "Rocky Mountain Greenway" ("Greenway"). This involves realigning the Greenway in such a manner that significant portions are located in Critical Habitat for the Preble's Meadow Jumping Mouse ("Jumping Mouse") designated under the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a), in the Rock Creek and Woman Creek drainages, and constructing the Greenway as a paved multipurpose trail instead of an unpaved gravel surface. Other changes include the alignment of the Rock Creek Trail through Jumping

Mouse critical habitat in the Rock Creek drainage, expansion of all or a portion of the Rock Creek Trail to a multiple use trail, and the potential elimination of seasonal closures, i.e. all the trails may now be open year round.

However, rather than prepare a supplement to the 2004 CCP/EIS to review these new changes, developments and information as required by NEPA, the USFWS prepared a so-called Environmental Action Statement (the "2018 EAS") that relies on certain "categorical exclusions" ("CEs") that can allow a federal agency to forego conducting environmental reviews if its proposed actions involve only "minor changes" to an action previously analyzed.  An agency's use of a CE is prohibited where, as here, "extraordinary circumstances" associated with the proposed action "may" have an impact to public safety and health, highly controversial environmental effects, highly uncertain and potentially significant effects or involve unique or unknown environmental risks.  Since these, and other, extraordinary circumstances apply here, USFWS' reliance on CEs, without any analysis as to their applicability, is highly improper.

Moreover, USFWS also has failed to revise its 2005 Comprehensive Conservation Plan ("CCP") to determine if the Trails and Multipurpose Facility are compatible with the Refuge and not inconsistent with public safety, as required by the National Wildlife Refuge Systems Administration Act ("NWRSAA").  USFWS is proceeding with Compatibility Determinations ("CDs") approved for the 2005 CCP, one of which (for the previously configured trails) expired in September, 2014.

In addition, to comply with the consultation requirements of Section 7 of the ESA in the 2018 EAS, the USFWS relies upon an informal intra-service consultation conducted in 2005 (the "2005 ESA Consultation"). That informal consultation and concurrence examined the effects of the USFWS' action under the 2004 CCP/EIS on the Jumping Mouse that is listed as a "threatened" species under the ESA and present within all of the major drainages in the Refuge.

6

The 2005 ESA Consultation concluded that implementation of the 2005 CCP "may affect but is not likely to adversely affect" the Jumping Mouse.

The 2005 ESA Consultation, however, is subject to mandatory reinitiation under 50 C.F.R. § 402.16(c) due to the subsequent designation of 12.5 miles of streams in the Refuge as critical habitat in 2010. 75 Fed.Reg. 78429, 78476—78476 (Dec. 12, 2010) ("Jumping Mouse Critical Habitat"). As such, the 2005 ESA Consultation is inadequate for the USFWS to meet its continuing consultation obligations under Section 7(a)(2), and to demonstrate compliance with the ESA under NEPA for the 2018 EAS.

In order to assure that this critical new information is analyzed, Plaintiffs seek *vacatur* of the decision to open the Refuge to Public Trails and a remand to USFWS to follow the procedures required by federal law, including adherence to the requirements of the Rocky Flats Act and its implementing regulations and preparation of a supplemental EIS under NEPA to address the substantial changes and new information since the 2004 CCP/EIS was prepared.  *See* 5 U.S.C. § 706(2) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or conducted] without observance of procedure required by law."). In addition, Plaintiffs seek a declaration that the 2005 ESA Consultation is inadequate to fulfill the USFWS' obligations under Section 7 of the ESA, and that the USFWS must reinitiate consultation to evaluate the effects of the Public Trails action on the Jumping Mouse and its critical habitat.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 551 *et seq.* (Administrative Procedure Act) including under 5 U.S.C. §§702-706, because (1) the action arises under the laws of the United States, (2) certain individual defendants are sued in

their official capacity; and (3) there is a present and actual controversy between the parties; 28

U.S.C. §§ 2201, 2202 (power to issue declaratory or injunctive relief in cases of actual

controversy); and the Equal Access to Justice Act, 28 U.S.C. § 2412.

2.      This Court has jurisdiction under 16 U.S.C. § 1540(c) and (g)(1)(A) (actions

arising under the ESA and citizen suit provision).  As required by Section 11(g)(2) of the ESA,

Plaintiff has provided USFWS with written notice of the alleged violations of the ESA at least

sixty days prior to the commencement of this action. 16 U.SC. § 1540(g)(2)(A) (the "60-Day

NOI").  Defendant USFWS have not remedied the alleged ESA violations as of the filing of this

Complaint.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(e)(3) because Plaintiffs reside in

this judicial district.  Venue is also appropriate under 28 U.S.C. § 1391(e)(1) because USFWS

has offices in this district.  Additionally, venue is proper pursuant to 28 U.S.C. § 1391(e)(2) and

5 U.S.C. § 703 because "a substantial part of the events or omissions giving rise to the claim"

took place in Colorado.

## PARTIES

4.      Plaintiff ROCKY MOUNTAIN PEACE & JUSTICE CENTER ("RMP&JC") is a

non-profit organization based in Boulder, Colorado.   RMP&JC was founded in 1983, and has

more than 1,000 members.  It organized events at Rocky Flats, including a near encirclement of

the site in 1983, with thousands of citizens protesting the facility.  RMP&JC and its members are

dedicated to publicizing the continued dangers associated with Rocky Flats contaminants and

ensuring that contaminants in the soil at Rocky Flats, including plutonium, beryllium and

uranium, do not become a source of harm to the public on the Rocky Flats site and the

surrounding communities.

5.      Plaintiff CANDELAS GLOWS/ROCKY FLATS GLOWS is committed to raising

awareness in the local community and beyond about Rocky Flats' nuclear history and the

ongoing issues concerning the Superfund site and surrounding area. After forming in 2013 to

speak out against housing developments being built adjacent to the contaminated land at Rocky

Flats, the community group has been influential in keeping the memory of Rocky Flats alive and

helping the community stay up to date with ongoing public safety and development issues.

Through presentations, community meetings and events, media, collaborations and more,

Candelas Glows/Rocky Flats Glows is committed to educating the community, honoring the

stories of former Rocky Flats workers and community members new and old.

6.     Plaintiff ROCKY FLATS RIGHT TO KNOW, started by two grandmothers who

live in Arvada, is an organization devoted to "keeping kids off Rocky Flats" and the installation

of permanent signage around the former nuclear weapons plant.  Rocky Flats Right to Know

advocates for robust public participation and fully informed decisionmaking for all residents

affected by the Rocky Flats site.

7.     Plaintiff ROCKY FLATS NEIGHBORHOOD ASSOCIATION was founded by a

Claimant Representative of the Energy Employees Occupational Illness Compensation Program

Act ("EEOICPA") and Arvada resident Dale Simpson Jr., focusing on social media

communication to engage with residents and other interested parties in dialogue about

assumptions, misinformation and misconceptions about the history and state of Rocky Flats.

8.     Plaintiff ENVIRONMENTAL INFORMATION NETWORK (EIN) INC. ("EIN")

was formed as an educational organization to disseminate technical information to lay persons to

help them understand the issues associated with radiotoxic and hazardous waste issues in the

region, especially regarding contamination from the Rocky Flats Nuclear Weapons Facility.  EIN

has worked for more than 15 years researching information and preparing briefings about Rocky

Flats to help individuals make educated decisions regarding hazards they may be exposed to, and

their health effects.

9.    Members of the Plaintiff groups live in communities located just downwind of the Refuge.  Plaintiffs' member are legitimately concerned that construction of the Public Trails on the Refuge, in areas where plutonium hot-spots were not discovered (or discovered and not remediated since <u>no</u> areas in the Refuge underwent remediation), will be dislodged and then migrate through the air and to their homes, where it will harm them physically through illnesses related to exposure to these contaminants.  Indeed, ten studies from 1970 through 2013 have found offsite plutonium contamination from Rocky Flats at levels representing up to hundreds of times background radiation from atmospheric weapons testing.  Another four studies demonstrate elevated cancer rates in the population living downwind of Rocky Flats.

10.    Numerous members of the Plaintiffs groups do research or reside next to the Refuge.  For instance, one of the members of the RMP&JC monitors activity from the perimeter of the Refuge on behalf of RMP&JC and circles the outer perimeter of the Refuge monthly.  He is concerned that the plutonium laden dust from construction and recreational activities will get caught up in the winds (which can exceed 100 mph in the area) and be breathed in by him, causing him health risks.  A member of the Environmental Information Network (EIN), who attributes the loss of her daughter to the effects of plutonium from swimming in Leyden Lake downwind from Rocky Flats, knows that airborne plutonium and other hazardous substances present on the Refuge will reach her property "very quickly" and harm her physically if it is disturbed by construction and recreation.

11.    All of the Plaintiff groups and many of their members are regularly engaged in advocacy and activities related to the Rocky Flats Refuge.  They will be harmed by USFWS' failure to follow statutory procedures requiring public input, thus diminishing the effectiveness of the Plaintiff organizations.  For instance, NEPA, ESA and the NWRSA contain procedures for

public input and comment that have been neglected by Defendants.

12. Plaintiff RMP&JC has an organizational interest in the protection and preservation of all bird, animal and other species resident on, and endemic to, the Refuge including, without limitation, species listed and threatened and endangered under the ESA. Many of RMP&JC's members who are involved in observing, photographing and studying such species, and the interests of RMP&JC and its members will be irreparably harmed if Defendants continue their violations of the law.

13. RMP&JC has members who live or work in communities located near or adjacent to the RFNWF, and RMP&JC's members observe and enjoy the open space and animal habitats provided by the Refuge for a variety of purposes including, but not limited to, photography, scientific study and wildlife observation, and intend to continue to do so in the future. RMP&JC's members derive recreational, spiritual, professional, aesthetic, educational, and other benefits and enjoyment from these activities.

14. Defendants' actions would deprive RMP&JC and its members of the recreational, spiritual, professional, aesthetic, educational, and other benefits they presently derive from the activities that involve the bird and animal species resident on the Refuge.

15. Additionally, Defendants' actions deny RMP&JC and its members their right to have the laws implemented and enforced, and the satisfaction and peace of mind associated with witnessing the enforcement of this nation's environmental protection laws. These injuries are actual and concrete and would be redressed by the relief sought herein.

16. Defendant USFWS is an agency within the U.S. Department of the Interior that is charged with the management of the National Wildlife Refuge System, including the Refuge. The Refuge was transferred to USFWS in 2007 by the U.S. Department of Energy. *WildEarth Guardians v. U.S. Fish and Wildlife Service*, 784 F.3d 677, 681 (10th Cir. 2015). The U.S. Department of Interior, USFWS' parent agency, has "administrative jurisdiction over all Refuge land…." *Town of Superior, et al. v. U.S. Fish and Wildlife Service*, 913 F. Supp. 2d 1087, 1105 (2012), *aff'd*, *WildEarth Guardians v. U.S. Fish and Wildlife Service,* 784 F.3d 677 (10th Cir.

2015). Defendant USFWS is also charged with complying with, and the enforcement of, the ESA for the species listed thereunder at issue in this action.

17.     Defendant RYAN ZINKE is being sued in his official capacity as Secretary of the Interior. In that capacity, he is responsible for ensuring executive agency actions comply with the ESA, NEPA and the NWRSAA.

18.     Defendant GREG SHEEHAN is being sued in his official capacity as Acting Director of the USFWS. In that capacity, he is responsible for ensuring USFWS actions comply with the ESA, NEPA and the NWRSAA.

19.     Defendant DAVID LUCAS is being sued in his official capacity as Project Leader of the Colorado Front Range National Wildlife Refuge Complex. Mr. Lucas is responsible for ensuring USFWS actions comply with the ESA, NEPA and the NWRSAA. Mr. Lucas signed the operative document in this lawsuit, the March 23, 2018 "Environmental Action Statement," authorizing the agency action challenged herein.

20.     Defendant U.S. FEDERAL HIGHWAY ADMINISTRATION ("FHWA") provides oversight and construction of transportation routes and is a primary project participant in the Rocky Mountain Greenway ("RMG") project.

21.     Defendant BRANDYE HENDRICKSON, is being sued in her official capacity as Acting Administrator of the Federal Highway Administration. In that capacity, she is responsible for ensuring executive agency actions comply with the ESA, NEPA and the NWRSAA.

22.     Defendant ELAINE L. CHAO, is being sued in her official capacity as the Secretary of Transportation. In that capacity, she is responsible for ensuring executive agency actions comply with the ESA, NEPA and the NWRSAA.

## **FACTUAL BACKGROUND**

23.     The former Rocky Flats nuclear production facility is among the nation's most polluted places.  Its name is synonymous with plutonium, a laboratory-developed, radioactive chemical element that was used at the facility to produce nuclear triggers for almost 40 years during the Cold War.[5]  After the FBI raided Rocky Flats and the operators' mismanagement and misconduct was exposed with federal criminal convictions, a federal jury in *Cook v. Rockwell* found that plutonium had migrated onto neighboring properties, where it will remain "indefinitely" causing an "increased risk of health problems."

24.     In 1951, the U.S. government acquired property located in unincorporated Jefferson County, between Denver and Boulder, Colorado, and developed the Rocky Flats Plant to manufacture nuclear weapon triggers, commonly called plutonium "pits."

25.     In 1975, the government purchased additional lands surrounding the facility from private landowners to create a buffer zone (the "Buffer Zone"), increasing its size to approximately 6,500 acres.  It was owned by the DOE and its predecessors and operated by contractors.

26.     "Over the course of almost forty years, manufacturing activities, spills, fires, and waste disposal released plutonium and other radionuclides, […] were dispersed by wind and rain into the soil and water systems in the Buffer Zone."[6]

27.     In 1989, agents of the FBI, led by Jon Lipsky, along with investigators from the Environmental Protection Agency ("EPA"), engaged in the first-ever environmental raid on a

---

[5] According to the U.S. Department of Energy ("DOE"), "[p]lutonium can be extremely dangerous, even in tiny quantities, if it is inhaled."  U.S. Department of Energy Office of Environmental Management *Closing the Circle on the Splitting of the Atom*, 19 (1996).
[6] *Town of Superior v. U.S. Fish and Wildlife Service*, 913 F.Supp.2d 1097, 1099 (D.Colo. 2012).

federal agency facility based on a two-year investigation into mismanagement and misconduct related to handling of the raw materials, manufacturing processes and disposal of toxic wastes at the Rocky Flats Plant.

28.     Also in 1989, the EPA placed the entire Rocky Flats Plant site on the National Priority List ("Superfund") under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") due to plutonium and other radionuclides contamination.

29.     In 1996, the DOE, EPA and the Colorado Department of Public Health and Environment ("CDPHE") entered into the Rocky Flats Cleanup Agreement documenting the remediation plan for the site.

30.     During the three decades between the plant's shutdown and the present, Congress created the Refuge out of lands surrounding Rocky Flats' highly contaminated central operable unit (the "COU").

**THE NATIONAL WILDLIFE REFUGE**

31.     In 2001, Congress passed the Rocky Flats National Wildlife Refuge Act ("Rocky Flats Act") to create a refuge after the Rocky Flats Plant site was remediated.

32.     In 2004, the USFWS issued a Comprehensive Conservation Plan/Environmental Impact Statement outlining the plans it had evaluated for managing the Refuge (the "2004 CCP/EIS").

33.     In February 2005, USFWS issued a record of decision adopting Alternative B in the 2004 CCP/EIS.

34.     Physical cleanup of the Rocky Flats Plant site was completed in October 2005 at a

contract expense of $7.7 billion over the ten-year project.[7]  The agencies declared this cleanup a

success because it came in under the original estimates of approximately $37 billion and 65

years.[8]

35.      In 2006, the DOE, EPA and CDPHE jointly issued a final cleanup corrective

action decision/record of decision ("CAD/ROD"), recommending continued DOE jurisdiction

over 1,308 acres that required further cleanup, but finding the surrounding property "acceptable

for unrestricted use and unlimited exposure."[9]

36.      The CAD/ROD carved out the COU, retained by DOE for future remediation.[10]

37.      In 2007, the remaining property, the peripheral operable unit (the "POU") was

removed from Superfund.  Jurisdiction was transferred by DOE to USFWS to establish the

3,953-acre Refuge.

38.      On March 23, 2018, Defendant USFWS disseminated the 2018 EAS which

provided the final location of the Public Trails planned for the Refuge.

39.      USFWS intends to commence construction of the Public Trails in time for a

Refuge opening in "Summer 2018," about 14 years after the last environmental review in the

2004 CCP/EIS when conditions at Rocky Flats, the proposals considered, and the alternative

selected were vastly different than currently exist.

40.      The Rocky Mountain Greenway, a collaboration between federal, state and local

---

[7]U.S. Department of Energy, Legacy Management, "CERCLA/RCRA Fact Sheet, Rocky Flats, Colorado Site," p. 2, (2016).
[8] *Id.*
[9] U.S. Department of Energy, U.S. Environmental Protection Agency, Colorado Department of Public Health and Environment, "Corrective Action Decision/Record of Decision for Rocky Flats Plant (USDOE) Peripheral Operable Unit and Central Operable Unit" (2006), p. 3-5.
[10] *Id.* at 15-16.

governments announced in 2012, is envisioned as a continuous trail or transportation corridor from the Rocky Mountain Arsenal to Rocky Mountain National Park.[11]

41.     In 2016, the USFWS revised its Public Trails locations to incorporate the Rocky Mountain Greenway's trail section through the Refuge, abandoning the previously planned routes around the Refuge's perimeter.

42.     In November 2017, the FHWA Central Federal Lands Highway Division published a Scoping Report for Rocky Flats National Wildlife Refuge Trails, including a map illustrating the route selected for the Rocky Mountain Greenway ("RMG") initiative. This report was prepared by Atkins North America, Inc., under a $30,098 contract let by the FHWA on May 22, 2017. The Scoping Report, which discusses environmental conditions, permits likely required, and construction factors, is silent as to any NEPA or other required reviews.  Upon information and belief, FHWA has entered into contracts for construction of one or more of the Public Trails, and is responsible for complying with NEPA.

43.     Despite the imminent construction of the Public Trails, neither USFWS nor FHWA have prepared a supplemental environmental impact statement ("SEIS"), analyzing the new information, circumstances, and scope of activity since the 2004 CCP/EIS was promulgated.

44.     USFWS and FHWA have selected the Public Trails routes before considering the risks and alternatives thereof, in contravention of the express purpose of NEPA to require an analysis of environmental effects *before* the agencies' plans are too far developed to change.  By avoiding the NEPA mandate, USFWS and FHWA are willfully ignoring their obligations to take a "hard look" and consider fully the impacts of their plans on the human environment.

---

[11] Adkins and PKM Design Group, "America's Great Outdoors, Rocky Mountain Greenway Feasibility Study, Phase 1: Broomfield to Boulder," p. 1 (2016).

45.     USFWS also has failed to revise the 2005 CCP to determine if the Public Trails are compatible with the Refuge and not inconsistent with public safety, as required by the National Wildlife Refuge Systems Administration Act ("NWRSAA").  USFWS is proceeding with Compatibility Determinations ("CDs") approved for the 2005 CCP, one of which (for the previously configured trails) expired in September, 2014.

**MIGRATION OF PLUTONIUM**

46.     Since the 2004 CCP/EIS, numerous developments show that Rocky Flats plutonium has migrated beyond the central operative unit ("COU").

47.      Federal decisions in the 10th Circuit and District of Colorado found that plutonium at Rocky Flats had migrated.  *WildEarth Guardians v. U.S. Fish and Wildlife Service*, 784 F.3d 677, 681 (10th Cir. 2015) ("As a result of the weapons work, some of the land became polluted by various hazardous materials, including plutonium."); *Town of Superior, et al. v. U.S. Fish and Wildlife Service*, 913 F. Supp. 2d 1087, 1099 (2012) ("… over the course of forty years, manufacturing activities, spills, fires, and waste disposal released plutonium and other radionuclides, which were dispersed by wind and rain into the soil and water systems in the buffer zone.").

48.     Such migration is surely linked to the massive amount of plutonium that went missing during the years the Rocky Flats Plant was producing nuclear triggers.  *See Cook v. Rockwell Int'l Corp.,* 580 F. Supp. 2d 1071, 1145–46 (D. Colo. 2006) ("It is undisputed that the cumulative MUF [material unaccounted for] during Defendants' operation of Rocky Flats is more than 2,600 pounds.").

49.     This plutonium has found its way to neighboring properties.  A jury found that plutonium from Rocky Flats' operations had contaminated a wide area of land beyond Rocky Flats' borders, and that such plutonium would "continue to be present" on these neighboring

properties "indefinitely." *Cook v. Rockwell International Corporation, etc.*, Civ. 90-cv-181-JLK (Jury Verdict Form, Feb. 14, 2006) at ¶¶ A(1-3) and B(1-3).   The jury found the plaintiffs would suffer "increased risk of health problems as a result of this exposure." *Id*. at C(1) and D(1).  The jury awarded damages totaling into the hundreds of millions of dollars. *Id*. at pp. 15, 24-27.

50.     DOE warned of the potential for plutonium migration from on-site "erosion," as contamination in the COU "may be brought to the surface by erosion or slumping of slopes."[12] Such erosion has occurred two times since the 2004 CCP/EIS.  The area experienced a 1000-year rainfall in September, 2013, with upwards of 10 inches of rain upstream of the Refuge, with "runoff from outside the Refuge flowing onto the Refuge [that] caused fast moving water and debris of over 2-3 feet in the drainages to impact roads and embankments…  The dike embankment of Lindsay Pond #1 [on the Refuge] was breached causing the loss of the outlet structure…."[13]  Damages to the dike, roads and monitors were assessed at $3 million.  *Id.*

51.     Similarly, between May and July, 2015 there was "over 20 inches of precipitation" (it was the wettest May in Colorado's recorded history) and vast amounts of erosion.[14] This caused the plutonium contaminated "Original Landfill" in the COU to "subside" and the "ground surface [] to move."[15]

52.      The sampling used to ascertain plutonium levels in 2006, including on the Refuge lands, has been subject to subsequent reviews that raised the following concerns:

a)   The sampling methodology excluded plutonium samples taken more than 8

---

[12] U.S. Fish & Wildlife Service, "Modified Leve III Preacquisition Environmental Contaminants Survey (2006), at 3
[13] U.S. Fish & Wildlife Service, pamphlet on 2013 "Flooding Effects."
[14] U.S. DOE, Rocky Flats Site Regulatory Contact Record, 2015-06 at 1.
[15] U.S. DOE, Rocky Flats Site Regulatory Contact Record, 2015-03 at 1.

feet below the surface,[16] even though significant sources of plutonium, such as building, tunnels and duct work, are buried at or below this depth.[17]

b)  The U.S. Government Accountability Office (GAO) disparaged the cleanup in 2006 for "DOE's failure to conduct independent assessments."[18] The methodology ultimately lowered the confidence level from 100% to 90% which reduced the likelihood of finding "hot spots" of plutonium.[19].

c)  The sampling minimized attempts to detect alpha particles, even though plutonium is primarily "an alpha emitter."

d)  The sampling methodology rejected the potential impacts from prairie dogs and other burrowing animals, although independent scientific research states that18 species of burrowing animals present at Rocky Flats dig down to as much as 16 feet, constantly redistributing soil and its contents, and disturb as much as 10 to 12 percent of the surface soil at the site annually.[20]

53.     Disturbingly, surveys compiled in 2016 by Metropolitan State University of Denver of individuals who lived downwind of Rocky Flats from 1952 to 1996 found that of the 1,745 surveys, there were 848 reports of cancer, with 414 of those cancers designated as "rare," typically occurring in 15 out of 100,000 people.

54.     Although CDPHE's response to the Metropolitan State University surveys stated that "the incidence of all cancers combined… was no different in the communities surrounding Rocky Flats than would be expected,[21]…  the agency found significant elevations of lung,

---

[16] CRA Facility Investigation – Remedial Investigation/Corrective Measures Study – Feasibility Study Report for the Rocky Flats Environmental Technology Site ("CRA"), Vol. 2 ("Methodology and Data Description") at 8, 4, and 11, n.5.  *See also* CRA, Executive Summary at 4.
[17] U.S. DOE, Rocky Flats Site Regulatory Contact Record, 2011-07 at 2.
[18] United States Government Accountability Office, GAO-06-352, NUCLEAR CLEANUP OF ROCKY FLATS: DOE Can Use Lessons Learned to Improve Oversight of Other Sites' Cleanup Activities, p. 48-9 (2006).
[19] *Id. at 101.*
[20] K. Shawn Smallwood, "Animal Burrowing Attributes Affecting Hazardous Waste Management," 22 Environmental Management 831 (1998); Morrison, Smallwood and Beyea, "Monitoring the dispersal of contaminants," at 293 (1997).
[21] LeRoy Moore, PhD, in comments to the Rocky Flats Stewardship Council, refuted the CDPHE

esophagus, colorectal, or prostate cancer in some of the communities surrounding Rocky Flats for 1990 – 2014."[22]

55.     The Public Trails configuration now traverses areas of Jumping Mouse critical habitat, which was designated after the 2014 CCP/EIS.

56.     The Refuge is subject to airborne migration of soils contaminants.  High winds prevail through most of Rocky Flats, blowing from the west to the east.  DOE created the 280-acre National Wind Technology Center at Rocky Flats in 1970s to conduct wind research.  The National Wind Technology Center is located adjacent to the northwest portion of Rocky Flats, where winds can exceed 100 miles per hour.

## LEGAL FRAMEWORK

### I.     The National Environmental Policy Act ("NEPA")

57.     NEPA is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  It requires federal agencies to take a "hard look" at the environmental effects of their proposed actions.  *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989).  "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken . . . . [and] [a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."  40 C.F.R. § 1500.1(b).  NEPA requires that all federal agencies "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."  40 C.F.R. §

---

summary findings as misrepresentative by inclusion of inappropriately remote zip codes north and west of the site in the Rocky Flats "neighborhood area." LeRoy Moore, PhD, "Health Risk of Living Downwind of Rocky Flats," p. 1-2, (2017).
[22] Colorado Department of Public Health & Environment, "Summary, Ratios of Cancer Incidence in Ten Areas around Rocky Flats, Colorado Compared to the Remainder of Metropolitan Denver, 1990-2014," p. 1-2, (2017).

1506.6(a).  Agencies "shall involve environmental agencies, applicants, and the public, to the extent practicable . . . ."  40 C.F.R. § 1501.4(b).

58.     Under NEPA, federal agencies are required to consider the potential environmental impact of *all* agency actions.  42 U.S.C. §§ 4321-4370m.  Agency action generally requires the preparation of an Environmental Assessment ("EA"), *see* 40 C.F.R. § 1508.9, an Environmental Impact Statement ("EIS"), *see id.* § 1502.9, or both.

59.     NEPA also anticipates that actions analyzed in the past may have been subject to "substantial changes in the proposed action" or the development of "significant new circumstances or information" pertaining to that action or its impacts. 40 C.F.R. § 1502.9(c)(1). When that occurs, a supplemental EIS is required to update the existing EIS.  *Id.*  To comply with NEPA, an agency must take a "hard look" at any new information and assess whether supplementation might be necessary." *Rags Over the Arkansas River, Inc. v. Bureau of Land Mgmt., 77* F. Supp. 3d 1038, 1052 (D. Colo. 2015) (internal citations omitted.)

60.     Under NEPA, agencies are tasked with developing procedures to implement NEPA.  40 C.F.R. § 1507.3.  These procedures include the establishment of specific categorical exclusions for actions which do not normally require an EA or an EIS.  40 C.F.R. § 1507.3(b). The DOI has identified a number of departmental categorical exclusions, codified in 43 C.F.R. § 46.210 and also found in the DOI's Departmental NEPA Manual (the "NEPA Manual") at 516 DM 2, Appendix 1.

61.     In an "Environmental Action Statement" dated March 23, 2018, Defendant USFWS specified three categorical exclusions in the NEPA Manual that allegedly apply to the proposed action (construction, and use by the public, of the Proposed Trails).  The specified categorical exclusions are:

>      (7)     Minor changes in the amounts or types of public use on Service …
>      lands, in accordance with existing regulations, management plans, and
>      procedures.
>      (9)     Minor changes in existing master plans, comprehensive
>      conservation plans, or operations, when no or minor effects are
>      anticipated….
>      (10)    The issuance of new or revised site, unit, or activity-specific
>      management plans for public use, land use, or other management activities
>      when only minor changes are planned.

516 DM 8.5(B)(7), (9), (10) (emphasis added).

62.     Any procedures addressing categorical exclusions "shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect."  40 C.F.R. § 1508.4.  The presence of "extraordinary circumstances" for a particular permit decision requires the preparation of either an EIS or an EA.  40 C.F.R. § 1501.4.

63.     Agencies have an independent obligation to ensure that extraordinary circumstances do not exist prior to issuing a categorical exclusion.  As the DOI's NEPA Manual explains, "[a]ny action that is normally categorically excluded must be evaluated to determine whether it meets any of the extraordinary circumstances in section 46.215; if it does, further analysis and environmental documents must be prepared for the action."  43 C.F.R. § 46.205.

64.     The DOI has identified a number of such extraordinary circumstances, described in both 43 C.F.R. 46.215 and 516 DM 2, Appendix 2.  Extraordinary circumstances include, in relevant part, circumstances that meet any of the following criteria:

>      (a)  Have significant impacts on public health or safety.
>
>      (c)  Have highly controversial environmental effects or involve unresolved
>           conflicts concerning alternative uses of available resources [NEPA
>           section 102(2)(E)].
>
>      (d)  Have highly uncertain and potentially significant environmental effects
>           or involve unique or unknown environmental risks.
>
>      (e)  Establish a precedent for future action or represent a decision in
>           principle about future actions with potentially significant environmental

effects.

(f) Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.

(h) Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species, or have significant impacts on designated Critical Habitat for these species.

(i) Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment.

(l) Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and Executive Order 13112).

46 C.F.R. § 46.215(a)-(l).

## II.    The National Wildlife Refuge Systems Administration Act ("NWRSAA")

65.    The National Wildlife Refuge System Administration Act ("NWRSAA"), as amended by the National Wildlife Refuge System Improvement Act of 1997, is a comprehensive organic statute establishing USFWS as the administrator of the National Wildlife Refuge System.[23]

66.    The System's original mission was "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans."[24]

67.    The USFWS may not "initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless the Secretary has determined that the use is a

---

[23] 16 U.S.C. §§ 668dd-668ee.
[24] 16 U.S.C. § 668dd(a)(2).

compatible use and that the use is not inconsistent with public safety."[25]

68.     When the conditions significantly change, or new information becomes available about the effects of an approved use, the USFWS must re-evaluate the use compatibility determination, including offering the public an opportunity to comment.[26]

69.     Once a CCP is completed, the USFWS is required to manage a refuge "in a manner consistent with the plan and shall revise the plan at any time if the Secretary determines that conditions that affect the refuge… have changed significantly."[27]

70.     The USFWS' CCP process must "ensure an opportunity for *active public involvement* in the preparation and revision of comprehensive conservation plans."[28]

## III.     The Endangered Species Act ("ESA")

71.     The ESA "provide[s] a program for the conservation [of] endangered species and threatened species" and "a means whereby the ecosystems upon which [such] species depend may be conserved." 16 U.S.C. § 1531(b).  The ESA defines "conservation" as "the use of all methods and procedures, which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3). The ESA imposes duties concerning implementation of the ESA for most terrestrial species on the Secretary of Interior; these duties have subsequently been delegated to the Administrator of the USFWS. 50 C.F.R. § 402.01(b).

72.     A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* at §

---

[25] 16 U.S.C. § 668dd(d)(3)(A)(i).
[26] 16 U.S.C. § 668dd(d)(3)(A)(viii).
[27] 16 U.S.C. § 668dd(e)(1)(E).
[28] 16 U.S.C. § 668dd(e)(4)(A) (emphasis added)

1532(20). An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range[.]" *Id*. at § 1532(6).  Once a species is listed as threatened or endangered, its critical habitat must be designated.  *Id*. at § 1533(a)(3). Critical habitat includes both occupied and unoccupied areas that contain features that are "essential to the conservation of the species[.]" *Id*. at § 1532(5)(A)(i)(I).

73.     Section 7(a)(2) of the ESA requires federal agencies to avoid actions that are "likely to jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification of" critical habitat. 16 U.S.C. § 1536(a)(2).   To ensure compliance with Section 7(a)(2), the "action agency" must undergo a consultation process with the "consulting agency" upon proposing to authorize, fund, or carry out an action that may affect a listed species or result in the destruction or adverse modification of the listed species critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. Where FWS is both the "action agency" and the "consulting agency" as in this situation, the USFWS engages in an "intra-Service" consultation process. "Informal consultation" is an optional process between the consulting agency and the action agency designed to assist the action agency in determining whether formal consultation is required. If during informal consultation the action agency determines, with the written concurrence of the consulting agency, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary. 50 C.F.R. § 401.13(a).

74.     If either proposed or listed species or proposed or designated habitat may be present in the action area of a "major construction activity," then the action agency shall prepare a Biological Assessment to are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 401.12(a).

75.     The determination whether a listed species is present shall be made on the basis of the best scientific and commercial data available. 16 U.S.C. § 1536(c)(1). If the consulting agency advises that no listed species or critical habitat may be present, then the action agency need not prepare a Biological Assessment and further consultation is not required. 50 C.F.R. §§ 402.12(d)(1). If the consulting agency advises, based on the best scientific and commercial data available, that a proposed or listed species or designated or proposed critical habitat may be present, then the action agency must prepare a Biological Assessment to facilitate this consultation process. 16 U.S.C. § 1536(c); 50 C.F.R. § 402.12.  In the Biological Assessment, the action agency must identify any proposed or listed species or designated or proposed critical habitat in the area, and evaluate the potential effects of the proposed action on such species or habitat. Id. § 1536(a)(2); 50 CFR §§ 402.02, 402.12, 402.14(d). If the action agency finds that no listed species or critical habitat may be present, and the action agency concurs in such finding, then the action agency need not prepare a Biological Assessment and further consultation is not required. 50 C.F.R. §§ 402.12(j) and (k)(1).  The consulting agency may use the Biological Assessment to inform its decision whether to concur in its findings, to initiate formal consultation or to prepare a Biological Opinion. 50 C.F.R. § 402.14(j) and (k)(2).

76.     "Formal consultation" is required when an agency's action is likely to "adversely affect" listed species or result in the destruction or adverse modification of critical habitat. 50 C.F.R. §§ 402.13, 402.14(a).  Formal consultation commences with the Federal agency's written request for consultation under Section 7(a)(2) of the ESA concludes with issuance of a Biological Opinion under section 7(b)(3) of the Act. 50 C.F.R. § 402.02. A Biological Opinion includes USFWS' determination of whether or not "jeopardy" and/or "adverse modification" is likely to occur due to the action and, if so, the reasonable alternatives that could avoid such ESA violations. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.02.

77.    In considering an agency's proposed action, the consulting agency must identify the action area, the environmental baseline, and the effects of the action, as those factors are defined in 50 C.F.R. §§ 402.02 and 402.14.  During the ESA consultation process and in developing a Biological Opinion, both the consulting agency and the action agency must use the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2). The ESA prohibits the "take" of threatened and endangered species. 16 U.S.C. § 1538(a)(2); 50 C.F.R. § 17.31(a). "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19). ESA regulations further define "harm" as "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

78.    The ESA creates two exceptions to the ESA's Section 9 take prohibition by authorizing the take of a listed species that incidentally results from an otherwise lawful activity. 16 U.S.C. § 1536(b)(4); § 1539(a)(1)(B). These exceptions include "take statements" for Federal agencies and "take permits" for persons who are not Federal agencies. 16 U.S.C. § 1536(b)(4) and (o)(2); § 1539(a)(1)(B).

79.    In a Section 7 consultation, if the Biological Opinion concludes that the agency action will not result in jeopardy to the species or adverse habitat modification, or if it offers prudent alternatives to avoid jeopardizing the species, then the consulting agency must provide a written Incidental Take Statement (the "ITS") specifying the "impact of such incidental taking on the species," any "reasonable and prudent measures that the Agency considers necessary or appropriate to minimize such impact," and sets forth the "terms and conditions . . . that must be complied with by the Federal agency to implement the proposed action." 16 U.S.C. § 1536(b)(4).

80.    Formal consultation must be reinitiated if "where discretionary Federal

27

involvement or control over the action has been retained or is authorized by law and: (a) if the amount or extent of taking specified in the incidental take statement is exceeded; (b) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (c) if the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (d) if a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16. Courts have interpreted the initiation requirement of this Regulation to apply to both "formal" and "informal" consultations. *See, e.g., Forest Guardians v. Johanns*, 450 F.3d 455, 458 (9th Cir. 2006). Even if the underlying action has been completed, an agency retains involvement or control over an action if it retains regulatory authority. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Service*, 785 F.3d 1075, 1086 (9th Cir. 2015).

## IV.     The Administrative Procedure Act ("APA")

81.     The APA provides for judicial review of final agency action by persons "aggrieved" by such action.  5 U.S.C. §§ 701, 706.  The actions reviewable under the APA include "preliminary, procedural, or intermediate agency action or ruling (. . .) on the review of the final agency action." *Id.* § 704. The APA also provides standards applicable when a federal agency proposes and adopts final rules and regulations.  *Id.* §§ 553, 551(4).  Agencies must provide general notice of any proposed rule making to the public through the Federal Register. *Id.*

82.     Under the authority of the APA, a reviewing court must hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2).  A reviewing court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be. . .

without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## FIRST CLAIM FOR RELIEF
(Violation of NEPA/APA - Failure to Prepare Adequate NEPA Analysis)

83.    Each and every allegation set forth in this complaint is incorporated herein by reference.

84.    The USFWS and FHWA are planning to construct and/or facilitate the construction of the Public Trails and a Visitor Center on the Refuge, and to open the Public Trails to public access, in the summer, 2018.

85.    USFWS is also planning to open 15 access points to the Refuge.

86.    These actions constitute a major Federal action that will impact the environment.

87.    USFWS and FHWA's decision to construct the Public Trails on Refuge lands that contain plutonium that has never been remediated has not been reviewed in an EA or EIS.

88.    Moreover, the Public Trails constitute a significant change to the plans that were analyzed during the prior NEPA analysis.

89.    The 2018 EAS represents an improper segmentation of connected actions that have not been subjected to a proper NEPA analysis.

90.    The 2004 CCP/EIS is outdated and the actions analyzed therein, and the alternative subsequently approved in the ROD ("Alternative B"), requires reexamination in an EIS supplement.

91.    Defendants have not prepared a supplemental environmental impact statement (SEIS) for the Public Trails.  The 2018 EAS does not qualify as a SEIS.  It does not examine the actions analyzed in the 2004 CCP/EIS, nor does it analyze the environment consequences of, and alternatives to, placing the Public Trails on soils contaminated with residual plutonium.

92.    As with the 2004 CCP/EIS, the 2018 EAS fails to address the remediation of the

Refuge, or the health and safety implications of constructing the Public Trails or opening the Refuge to the public.

93.     Defendants did not prepare an EA or EIS for the Public Trails because they relied on NEPA "categorical exclusions" for minor changes from the 2004 CCP/EIS.

94.     Defendants did not prepare adequate written documentation for the Project Permit or in any other decision document evaluating whether extraordinary circumstances exist, and ultimately determining whether this action can be lawfully excluded from NEPA review in light of an objective evaluation of the applicable "extraordinary circumstances" factors.

95.     Even had USUSFWS analyzed the propriety of applying categorical exclusions to this project, the Project Permit does not qualify for a NEPA categorical exclusion because several extraordinary circumstances exist here and thus require preparation of an EA or EIS.

96.     USUSFWS did not independently acknowledge in its plans for the Proposed Trails the existence of extraordinary circumstances and also disregarded evidence of extraordinary circumstances in this case, in violation of 46 C.F.R. §§ 46.205 and 46.215.

97.     At least eight extraordinary circumstances exist with regard to the construction and opening up of the Public Trails to public access, as doing so will:

> (i)     Have significant impacts on public health or safety.
>
> (ii)    Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources [NEPA section 102(2)(E)].
>
> (iii)   Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.
>
> (iv)    Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.
>
> (v)     Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.

(vi)     Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species, or have significant impacts on designated Critical Habitat for these species.

(vii)    Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment; and

(viii)   Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and Executive Order 13112).

98.     In erroneously relying on a categorical exclusion when issuing the Proposed Trails, USUSFWS circumvented public notification, review, and comment on its permitting decision in a manner that is inconsistent with NEPA and its express purpose of "insur[ing] that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1.

99.     USFWS' implicit reliance on categorical exclusions in authorizing the construction and opening up of the Public Trails to public access, despite the existence of extraordinary circumstances, violates NEPA and its implementing regulations, neglects public input, is arbitrary, capricious, or otherwise not in accordance with law, and occurred without observance of procedure required by law. *See* 5 U.S.C. § 706(2)(A), (D). Plaintiff can never recover from the procedural failure to consider, as required under NEPA, the alternatives and environmental consequences of a decision, once that decision is implemented.

## SECOND CLAIM FOR RELIEF
(Violation of the National Wildlife Refuge Systems Administration Act ("NWRSAA"))

100.    Each and every allegation set forth in this complaint is incorporated herein by reference.

101.    Defendants are planning to construct and/or facilitate the construction of the

Public Trails on the Refuge.

102.     The Public Trials constitute a significant change to the plans that were analyzed during the 2004 CCP/EIS analysis.

103.     The Compatibility Determination noted that trails are not a priority use and required a mandatory re-evalution after 10 years, or in September 2014.

104.     Defendants have not followed the required process to prepare a revised CCP incorporating the Public Trails, as expressly required whenever *additional areas in the Refuge are opened for development.  That process requires additional evaluation under NEPA, a new Compatibility Determination, and a new Intra-Service Section 7 Consultation* (under the Endangered Species Act).[29]

105.     Defendants have not proposed or approved new Compatibility Determinations authorizing the use of the Public Trails.

**THIRD CLAIM FOR RELIEF**
**(Violation of the ESA Section 7(a)(2) -- Failure to Initiate and**
**Complete Consultation)**

106.     Each and every allegation set forth in this Complaint is incorporated herein by reference.

107.     USFWS' current plans for construction and implementation of the Public Trails project at the Refuge as described in the 2018 EAS differ substantially from the plans considered in the 2004 CCP/EIS process and adopted in the 2005 ROD, and are "agency actions" within the meaning of the ESA, Section 7(a)(2), 16 U.S.C. § 1536(a)(2).

108.     At all times relevant herein, the Jumping Mouse was a threatened species under the ESA, and since 2010 critical habitat has been designated for the Jumping Mouse within the

---

[29] 2004 CCP/EIS p. 263.

Refuge.

109.    At all times relevant to this claim, threatened and endangered species and designated critical habitat may be present within the action area of the Public Trails project including, without limitation, the threatened Jumping Mouse and its designated critical habitat.

110.    The USFWS' current plans for the Public Trails project are likely to adversely affect endangered species, threatened species, and/or critical habitat of listed species within the "action area"

111.    The USFWS has significantly changed the activities planned for the Refuge since the 2005 ESA Consultation without undergoing any further ESA Section 7(a)(2) consultation.

112.    The USFWS failed to prepare a Biological Assessment to identify any proposed or listed species or designated or proposed critical habitat in the area, and to evaluate the potential effects of the proposed action on such species or habitat to determine if formal consultation should be initiated. 16 U.S.C. §§ 1536(a)(2); 16 U.S.C. § 1536(c); 50 CFR §§ 402.02, 402.12, 402.14(d).

113.    The USFWS failed to prepare a biological opinion for the Public Trails project as described in the 2018 EAS, and  failed to develop an incidental take statement under 16 U.S.C. 1536(b)(4).

114.    Accordingly, the USFWS violated Section 7(a)(2) of the ESA, 16 U.S.C. § 1536, by failing to initiate and complete consultation for the agency action described in the 2018 EAS.

115.    The USFWS  violated Section 7(a)(2) of the ESA, 16 U.S.C. § 1536, by failing to insure that its agency action is not likely to jeopardize the continued existence of any threatened or endangered species, or result in the destruction or adverse modification of their critical habitat.

116.    The USFWS was advised of these violations of the ESA in the 60-Day NOI, but has not taken any action to address such violations, which are continuing or reasonably likely to continue to occur.

117.    The USFWS' failure to initiate and complete ESA Section 7(a)(2) consultation is arbitrary, capricious, an abuse of discretion, and not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. § 706(2).

118.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation under Section 11(g)(4) of the ESA, 16 U.S.C. § 1540(g)(4).

### FOURTH CLAIM FOR RELIEF
**(Violation of the ESA Section 7(a)(2) -- Failure to Reinitiate Consultation Under 50 C.F.R. § 402.16(c))**

119.    Each and every allegation set forth in this Complaint is incorporated herein by reference.

120.    Consultation for an agency action under Section 7(a)(2) must be reinitiated "where discretionary Federal involvement or control over the action has been retained or is authorized by law and (. . .) (c) if the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion (. . .)." 50 C.F.R. § 402.16.

121.    At all times relevant to this claim, the action agency, the USFWS, has retained discretionary control over the Public Trails project as described in the 2004 CCP/EIS and adopted in the 2005 ROD.

122.    The Public Trails project as described in the 2004 CCP/EIS and adopted in the 2005 ROD has been subsequently modified in the 2018 EAS in a manner that will cause an effect to the listed species or critical habitat that was not considered in the 2005 ESA Consultation.

123.    The USFWS' failure to reinitiate consultation is a violation of Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.16(c).

124.    The USFWS was advised of these violations of the ESA in the 60-Day NOI, but has not taken any action to address such violations, which are continuing or reasonably likely to continue to occur.

125.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation under Section 11(g)(4) of the ESA, 16 U.S.C. § 1540(g)(4).

**FIFTH CLAIM FOR RELIEF**
**(Violation of the ESA Section 7(a)(2) -- Failure to Reinitiate Consultation Under 50 C.F.R. § 402.16(d))**

126.    Each and every allegation set forth in this Complaint is incorporated herein by reference.

127.    Consultation for an agency action under Section 7(a)(2) must be reinitiated "where discretionary Federal involvement or control over the action has been retained or is authorized by law and (. . .) (d) if a new species is listed or critical habitat designated that may be affected by the identified action..." 50 C.F.R. § 402.16.

128.    At all times relevant to this claim, the action agency, the USFWS, has retained discretionary control over the Public Trails project as described in the 2004 CCP/EIS and adopted in the 2005 ROD.

129.    Critical habitat for the Jumping Mouse consisting of 12.5 miles of streams and riparian habitat in the Refuge was designated in 2010. 75 Fed.Reg. 78429, 78475—78476 (Dec. 12, 2010).

130.    The designation of the Jumping Mouse critical habitat in 2010 triggered the mandatory reinitiation of the 2005 ESA Consultation, and the USFWS' failure to reinitiate consultation is a violation of Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.16(d).

131.    The USFWS was advised of these violations of the ESA in the 60-Day NOI, but has not taken any action to address such violations, which are continuing or reasonably likely to continue to occur.

132.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with

this litigation under Section 11(g)(4) of the ESA, 16 U.S.C. § 1540(g)(4).

## SIXTH CLAIM FOR RELIEF
### (Violation of the APA -- Failure to Reinitiate Consultation
### Under 50 C.F.R. § 402.16(c) and (d))

133.    Each and every allegation set forth in this Complaint is incorporated herein by reference.

134.    Under 50 C.F.R. § 402.16, Defendant USFWS, as both the action agency and the consulting agency, has a duty to reinitiate consultation upon the occurrence of one of the triggering events specified in such Regulation.

135.    The Public Trails project as described in the 2004 CCP/EIS and adopted in the 2005 ROD has been subsequently modified in the 2018 EAS in a manner that will cause an effect to the listed species or critical habitat that was not considered in the 2005 ESA Consultation, triggering the mandatory reinitiation of consultation under 50 C.F.R. § 402.16(c).

136.    The designation of Jumping Mouse Critical Habitat in 2010 triggered mandatory reinitiation of the 2005 ESA Consultation under 50 C.F.R. § 402.16(d).

137.    The USFWS' failure to reinitiate ESA Section 7(a)(2) consultation is arbitrary, capricious, an abuse of discretion, and not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. § 706(2). Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Declare that Defendants have violated NEPA, the ESA, and the NWRSAA;

2.    Declare that the Defendants' actions as set forth in this Complaint are arbitrary, capricious, an abuse of discretion, are not in accordance with law and are without observance of

procedures required by law and therefore must be set aside pursuant to the APA, 5 U.S.C. § 706(2);

3.      Enjoin any future work by Defendants and/or their agents on the Public Trails and Visitor Center until Defendants have complied with their obligations under NEPA, the ESA, the NWRSAA and certified to this Court that they have complied with the applicable laws;

4.      Vacate and set aside any and all plans, designs, contracts, requests for proposals, memorandums of understanding, decisions, opinions, findings by Defendants for the Public Trails and Visitor Center because of Defendants' failure to comply with their obligations under NEPA, the ESA, and the NWRSAA;

5.      Return any funds received to the U.S. Department of Energy, and vacate any obligations made, by Defendants for the Public Trails or Visitor Center because of Defendants' failure to comply with their obligations under NEPA, the ESA, and the NWRSAA;

6.      Award Plaintiffs its costs and expenses, including reasonable attorneys' fees, as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412, the ESA 16 U.S.C. § 1540(g)(4) or other authority; and

7.      Grant Plaintiffs such further declaratory and injunctive relief as may be necessary and appropriate or as the Court deems just and proper.

PLAINTIFFS DEMAND A JURY TRIAL.

Respectfully submitted this 1st day of May, 2018.

LAW OFFICES OF RANDALL M. WEINER, P.C.

*Original Signature on file at*
*Law Offices of Randall M. Weiner, P.C.*

By:    */s/ Randall M. Weiner*
        Randall M. Weiner
        Annmarie Cording

Andrew G. Ogden, *of counsel*
Dana J. Stotsky, *of counsel*
3100 Arapahoe Avenue, Suite 202
Boulder, CO  80303
Telephone: (303) 440-3321
FAX: (720) 292-1687
E-mail: randall@randallweiner.com

Attorneys for Plaintiffs