IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 18-cv-01017-PAB

ROCKY MOUNTAIN PEACE & JUSTICE CENTER,
CANDELAS GLOWS/ROCKY FLATS GLOWS,
ROCKY FLATS RIGHT TO KNOW,
ROCKY FLATS NEIGHBORHOOD ASSOCIATION, and
ENVIRONMENTAL INFORMATION NETWORK (EIN) INC.,

Plaintiffs,

v.

UNITED STATES FISH AND WILDLIFE SERVICE,
GREG SHEEHAN, in his official capacity as Acting Director, U.S. Fish and Wildlife Service,
RYAN ZINKE, in his official capacity as Secretary of the Interior,
DAVID LUCAS, in his official capacity as Project Leader, Region 6, U.S. Fish and Wildlife Service,
UNITED STATES FEDERAL HIGHWAY ADMINISTRATION,
BRANDYE HENDRICKSON, in her official capacity as Acting Administrator of the United States Federal Highway Administration, and
ELAINE L. CHAO, in her official capacity as Secretary of Transportation,

Defendants.

---

**ORDER**

---

This matter is before the Court on Plaintiffs' Motion for and Memorandum in Support of Preliminary Injunction [Docket No. 7]. Plaintiffs seek a preliminary injunction against trail construction and the opening of public access to the trails at the Rocky Flats National Wildlife Refuge (the "Refuge"). Docket No. 7 at 1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

## I. BACKGROUND[1]

This is an appeal of administrative actions taken by the United States Fish and Wildlife Service (the "FWS") and the United States Federal Highway Administration (the "Highway Administration") that reroute sections of trails planned for construction in the Refuge and open the Refuge to visitors from the general public beyond guided tours.

The Refuge is located in Jefferson County, Colorado on land surrounding the decommissioned nuclear processing facility at Rocky Flats. The so-called "industrial area," where the processing facilities were located, and the land immediately surrounding it are still administered by the United States Department of Energy ("DOE") and are not at issue in this litigation, except insofar as the facility was the source of plutonium contamination affecting the Refuge.

In 2001, Congress passed the Rocky Flats National Wildlife Refuge Act, Pub. L. No. 107-107, 115 Stat. 1012 (2001) (the "Refuge Act"). Congress determined that the "national interest requires that the ongoing cleanup and closure of the entire site be completed safely, effectively, and without unnecessary delay and that the site thereafter be retained by the United States and managed so as to preserve the value of the site for open space and wildlife habitat." *Id.*, § 3172(a)(4). Congress also found that the "Rocky Flats site provides habitat for many wildlife species, including a number of threatened and endangered species," and that "[e]stablishing the site as a unit of the

[1] The following facts are undisputed unless otherwise indicated. Additional factual background is available in numerous decisions related to Rocky Flats in this district and the Tenth Circuit. *See, e.g., Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1259 (10th Cir. 2002); *Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1098 (D. Colo. 2012), *aff'd sub nom. WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677 (10th Cir. 2015).

National Wildlife Refuge System will promote the preservation and enhancement of those resources for present and future generations. *Id*., § 3172(a)(5).

On September 16, 2004, during the ongoing cleanup efforts at Rocky Flats, the FWS issued the Rocky Flats National Wildlife Refuge Final Comprehensive Conservation Plan and Environmental Impact Statement (the "2004 CCP"). R. at 1327. The 2004 CCP noted that the DOE was responsible for the ongoing cleanup of Rocky Flats, with oversight from the Environmental Protection Agency ("EPA") and the Colorado Department of Public Health and Environment ("CDPHE"). R. at 1361. Upon certification by the EPA that the cleanup was complete, the Rocky Flats site would be divided into two jurisdictions. *Id*. The DOE would retain jurisdiction over the industrial area and its immediate surroundings to "protect cleanup facilities and monitoring systems." *Id*. The FWS would assume responsibility for the other portions of the Rocky Flats site, with these transferred portions forming the Refuge. *Id*. The 2004 CCP contemplated that, following the creation of the Refuge, multi-use trails would be created in the Refuge that would be accessible to the public. R. at 1368 ("Visitor use facilities would include about 16 miles of trails, a seasonally staffed visitor contact station, trailheads with parking, and developed overlooks. . . . Most trails would use existing road corridors. Public access would be by foot, bicycle, or horse, with limited car access to two parking areas on the Refuge."). The 2004 CCP stated that FWS "believe[d] that the health risk from working on or visiting Refuge lands would be low" and disclosed that "the estimated increased cancer risk from exposure to residual soil contamination of 7 pCi/g is 1 in 1 million for the Refuge worker, and 0.6 in 1 million (or 6

in 10 million) for the Refuge visitor." R. at 1363.[2] These values were calculated based on the added radiation exposure of a Refuge worker spending "4 hours indoors and 4 hours outside for 250 days a year for 18.7 years" and of a Refuge visitor spending "2.5 hours outside for 100 days a year for 6 years (child) or 24 years (adult)." *Id*. The 2004 CCP also noted that "the majority of the public use facilities would be located in areas where the residual contamination is much lower (less than 1 pCi/g)." *Id*. On February 16, 2005, the FWS issued a record of decision ("2005 ROD") adopting the 2004 CCP for the Refuge. R. at 1326. The 2005 ROD included a map of the approved trail system for the Refuge:




---

[2] A *curie* is a standard measure for the intensity of radioactivity contained in a sample of radioactive material. The notation "pCi/g" indicates the number of picocuries of radiation given off by a gram of sampled material. *See* R. at 1361. One picocurie is 1/1,000,000,000,000 (one trillionth) of a curie.

R. at 1319 (trial map from 2005 ROD).

On May 25, 2007, the EPA published a notice in the Federal Register certifying that the portion of the Refuge site that would be transferred to the Department of Interior and form the Refuge "poses no significant threat to public health or the environment and, therefore, no further remedial measures pursuant to CERCLA are appropriate." R. at 5515, National Oil and Hazardous Substances Pollution Contingency Plan; National Priorities List, 72 Fed. Reg. 29276 (May 25, 2007); *see also* R. at 5508 (map of transferred area in letter of transfer to FWS); R. at 5511 (June 11, 2007 EPA certification letter). "CERCLA" refers to the Comprehensive Environmental Response, Compensation, and Liability Act, commonly known as the "Superfund," enacted on December 11, 1980 and codified at 42 U.S.C. § 9601 *et seq*. *See also* Superfund Amendments and Re-authorization Act, Pub. L. No. 99-499, 100 Stat. 1613 (Oct. 17, 1986). Under this law, the EPA established standards and procedures for cleanup of radioactive materials at Superfund sites like Rocky Flats. *See* 42 U.S.C. § 9602; 40 C.F.R. Ch. I, Subch. J, Pt. 300.

After the Refuge came under the supervision of the FWS in 2007, the FWS acquired additional land at the southwest corner of the Refuge, which had not previously been part of Rocky Flats and which was not subject to prior cleanup efforts. *See* Docket No. 14 at 16; R. at 4. This parcel of land is referred to by the parties as the "Section 16 Parcel" and contains an old coal and clay mine. *Id*.; R. at 1044. Before the land was acquired, the FWS conduced a survey of the area, finding "no known or observable environmental contaminants issues." R. at 1038. The August 11, 2011 survey report did note the presence of debris in the area, including a "rusted storage

barrel at the water's edge" near the old mine that "appear[ed] to be empty." R. at 1048. The report recommended removing the barrel and other refuse from the Section 16 Parcel. R. at 1038.

On December 15, 2010, the FWS issued a final rule revising the designation of critical habitat for the threatened Preble's Meadow Jumping Mouse ("Preble's mouse") in Colorado. Endangered and Threatened Wildlife and Plants; Revised Critical Habitat for the Preble's Meadow Jumping Mouse in Colorado, 75 Fed. Reg. 78430 (Dec. 15, 2010). The FWS "determined that lands on the Rocky Flats Site are essential to the conservation of the species." *Id*. at 78437. The land designated as critical habitat for the Preble's mouse within the Refuge includes Rock Creek, Walnut Creek, and Woman Creek as well as the land 120 meters to either side of these creeks. R. at 3237; *see also* R. at 3177 ("In total, the revised designation [of critical habitat in Colorado] includes approximately 411 miles of rivers and streams and 34,935 acres of streamside habitat in Boulder, Broomfield, Douglas, El Paso, Jefferson, Larimer, and Teller counties, Colorado.")

On September 21, 2011, the EPA and CDPHE sent a letter in response to the FWS's questions requesting "additional information regarding residual risk" at the Refuge. The letter stated that the health risks at the Refuge "are within or below the acceptable CERCLA risk range ($10^{-4}$ to $10^{-6}$ risk of excess cancer incidence) and that radiation doses are below State standards." R. at 5487. The letter noted that the average concentrations of radioactive materials was "about 3.2 pCi/g" even in the eastern portion of the Refuge, which is downwind of the industrial area (based on the prevailing winds) and therefore expected be more contaminated, and that this level is

"well below the 9.8 pCi/g that corresponds to a 1 x $10^{-6}$ risk for a [Refuge visitor]." R. at 5488. Based on this testing data, the EPA and CDPHE stated that the "lands comprising the Refuge are suitable for unlimited use and unrestricted exposure." *Id*.

In November 2017, the Highway Administration issued a Scoping Report for construction of trails within the Refuge. Docket No. 7-1. On March 23, 2018, the FWS issued an Environmental Action Statement (the "2018 EAS") to make changes to the 2004 CCP. R. at 1. In doing so, the FWS invoked the categorical exclusions under 40 C.F.R. § 1508.4 allowing for "minor changes in the amounts or types of public use" of public lands "in accordance with existing regulations, management plans, and procedures" as well as categorical exclusions for changes to such plans "when no or minor effects are anticipated." R. at 9. At issue here, the 2018 EAS made changes to the trail routes planned in the 2004 CCP. R. at 7-8. As reflected in the 2018 EAS map below, the FWS changed the Walnut Creek trail in the northeast of the Refuge into a loop, extended the Rock Creek trail on a curving path in the northwest of the Refuge, and extended the Rocky Mountain Greenway Trail to the old mine in the Section 16 Parcel as well as changing its course along the south of the Refuge. *Id*.




R. at 7.

On May 1, 2018, plaintiffs filed their complaint in this case. Docket No. 1. Plaintiffs bring claims for violations of the federal Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*. On May 31, 2018, plaintiffs filed their motion for a preliminary injunction. Docket No. 7. On June 27, 2018, defendants filed the administrative record. Docket No. 26. On June 28, 2018, defendants filed motions seeking to exclude certain evidence attached to plaintiffs' motion and to exclude certain witnesses from testifying. Docket Nos. 28, 29. On July 12, 2018, the Court granted defendants' motions in part. Docket No. 34. On July 16, 2018, the Court held a hearing on plaintiffs' motion. Docket No.

38. After the hearing, plaintiffs filed a response to new authority cited by defendants at the hearing. Docket No. 39.

**II. STANDING FOR ESA CLAIMS**

The party seeking redress bears the burden of establishing standing. *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). To carry this burden, plaintiffs must show "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Id*. at 543 (internal quotation marks and alteration marks omitted); *Lujan*, 504 U.S. at 560-61. As organizations with members, plaintiffs can establish standing either in their own right or on behalf of their members. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

Defendants challenge plaintiffs' standing with respect to their ESA claims concerning the Preble's mouse. Docket No. 14 at 19-20. Defendants argue that the preliminary injunction testimony of Randal Stafford, and his declaration in support of the motion, fail to show that plaintiffs may suffer a concrete injury to a protectable interest that is causally related to the challenged administrative action. *Id*.

Plaintiffs' complaint contains no specific allegations about plaintiffs' or their members' interests in the Preble's mouse. *See* Docket No. 1 at 11, ¶¶ 12-15. And plaintiffs do not argue that they have standing to bring their ESA claims on the basis of the interests of any of their members other than Mr. Stafford. *See* Docket No. 22 at 10. Mr. Stafford is a member of plaintiff Rocky Mountain Peace & Justice Center. Docket

No. 7-7 at 1, ¶ 1. He stated in his declaration that he has

> a personal interest in the protection and conservation of the bird, animal and other species endemic and resident on the Refuge, including but not limited to the threatened Preble's Meadow Jumping Mouse. I derive great aesthetic, spiritual and recreational benefits from looking for and seeing such species, studying them, enjoying their presence in their natural environment and knowing that the provisions of the Endangered Species Act are protecting and conserving the Jumping Mouse and its Critical Habitat in the Refuge.

*Id*. at 2, ¶ 4. Mr. Stafford's testimony at the hearing affirmed the general statements in his declaration and established that his past activity in the areas near the Refuge consists of recreation and bird watching. Although he testified that he found the fact that the Preble's mouse can jump four feet in the air was interesting, he testified that he would not go to the Refuge to look for the mouse even if he thought the Refuge were safe. In fact, Mr. Stafford testified that his interest in the Preble's mouse is derivative of his interest in birds, particularly birds of prey, which may use the Preble's mouse as a food source.

Although a specific aesthetic interest in the environment of the Refuge may support standing, *see Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice." (citing *Morton*, 405 U.S. at 734-36)), plaintiffs must show that at least one of their members "is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant[s]; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Id*. at 493

(citing *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-181 (2000)). Plaintiffs' attempt to show standing on the basis of Mr. Stafford's testimony is undermined by evidence in the administrative record and the tenuous link between his stated interest and the challenged administrative action. As noted by defendants and as testified at the hearing by David Lucas, the FWS Project Leader for the Refuge, evidence of the Preble's mouse has not been found on the Refuge since 2003. *See* Docket No. 14 at 7-8. While the FWS acknowledges that the Preble's mouse may still be present in the Refuge and acknowledges the importance of maintaining the mouse's critical habitat, the failure to capture mice for the last fifteen years suggests that their numbers within the Refuge are small. *Id.; see, e.g.*, R. at 2300, 2337 (Refuge trapping records for 2016 and 2017). Plaintiffs challenge administrative actions rerouting trails and, while such actions may impact the Preble's mouse's critical habitat, plaintiffs did not introduce evidence that would support an inference that the changes to the trail routes were likely to cause a harm to Mr. Stafford's interests in birds of prey. Given the unrebutted evidence that there are probably limited numbers of Preble's mice in the Refuge, there is even less reason to believe that alterations to the trails would reduce the food available to birds of prey in which Mr. Stafford has an interest. *See Summers*, 555 U.S. at 494 ("[R]espondents can demonstrate standing only if application of the regulations by the Government will affect *them* in the manner described." (emphasis in original)). The Court does not rule out the possibility that a party could show that impact of a proposed action on the food chain would impact a species of interest to that party, but plaintiffs have not presented evidence that such a possibility is more than "conjectural or hypothetical" in this case,

which is insufficient to confer standing. *Id*. at 493. The Court finds that plaintiffs have failed to meet their burden to show evidence of standing in relation to their ESA claims. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006) ("[T]he Court's standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press." (citing *Allen v. Wright*, 468 U.S. 737, 750 (1984)); *Colorado Outfitters Ass'n*, 823 F.3d at 544 ("[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." (quoting *Lujan*, 504 U.S. at 561)). Accordingly, the Court will deny plaintiffs' motion insofar as it is based on plaintiffs' ESA claims and dismiss plaintiffs' ESA claims without prejudice for lack of jurisdiction. *Colorado Outfitters Ass'n*, 823 F.3d at 554 (remanding for dismissal without prejudice where the plaintiffs failed to prove standing at trial).

## III. PRELIMINARY INJUNCTION MOTION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). "To obtain a preliminary injunction, the moving party must demonstrate four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter*, 555 U.S. at 20). "Moreover, 'because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.'" *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th

Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)) (internal quotation marks omitted).

The Court limits its discussion to the issue of irreparable harm because it is dispositive. *See Winter*, 555 U.S. at 23-24; *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013) (unpublished) ("A party seeking a preliminary injunction must prove that all four of the equitable factors weigh in its favor." (emphasis omitted)).

"To show a threat of irreparable harm, a plaintiff must demonstrate 'a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'" *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016) (quoting *RoDa Drilling Co.*, 552 F.3d at 1210). The Supreme Court has emphasized that the standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

Plaintiffs' claim that their members will suffer irreparable harm to their health if trail construction and usage is allowed to proceed.[3] In particular, plaintiffs argue that, "[b]ecause the adverse human health impacts from inhaling plutonium are irreparable, and because Plaintiffs' members visit or live in areas impacted by previous plutonium events, disturbance of the Refuge soils from this summer's construction and future Trails' usage is likely to result in physical harm to Plaintiffs' members." Docket No. 7 at 28 (footnote and citations omitted). In support of this theory, plaintiffs presented testimony by John Barton, Dr. Harvey Nichols, Dr. Michael Ketterer, Dr. Timothy

[3] As the Court discussed in its July 12, 2018 Order, plaintiffs do not cite authority showing that "harm to their organizational missions or to the public in general . . . can be the type of irreparable harm supporting issuance of an injunction." Docket No. 34 at 5 n.2.

Mousseau, Elizabeth Panzer, Jon Lipsky, and Randal Stafford. Docket No. 38 at 2-4. Messrs. Barton and Lipsky generally presented testimony about the well-documented mismanagement and failure to control plutonium while Rocky Flats was in operation. Dr. Nichols presented testimony about testing he did at Rocky Flats from 1974 to 1977 while the plant was in operation. Dr. Ketterer testified about more recent testing of the areas surrounding the Refuge. Dr. Mousseau testified about plutonium toxicity. Ms. Panzer and Mr. Stafford testified about their concerns with plutonium contamination in dust blown from Rocky Flats into the surrounding area.

Plaintiffs stated at the hearing that they did not challenge the EPA and CDPHE's findings about the expected health effects of the plutonium levels in the Refuge's soil. *See also* Docket No. 22 at 4. Instead, plaintiffs sought to distinguish these agencies' findings about the health risks associated with plutonium particles in dust and the health risks associated with inhalation of windblown dust containing plutonium. In particular, plaintiffs presented evidence that there is no safe exposure level for inhaled plutonium, i.e., that any amount of exposure is potentially harmful to health, and that exposure to inhaled plutonium is more harmful than exposure to the radiation produced from the plutonium alone. Plaintiffs did not, however, present any qualitative evidence about the health risks associated with inhaled plutonium exposure at the levels found in the Refuge or otherwise quantify the increased health risk that could result from the challenged administrative action. Thus, plaintiffs presented evidence that the health risks are greater than those stated by the EPA and CDPHE's findings because inhalation of plutonium particles presents a greater risk than radiation exposure alone, but plaintiffs did not present evidence about how much greater those potential risks are

or, more importantly, about the increased health risks associated with the challenged administrative action.[4]

Both the EPA and the CDPHE, agencies with expertise in the health risks associated with environmental contaminants, have repeatedly certified that the Refuge is "suitable for unlimited use and unrestricted exposure" by workers and visitors spending significant amounts of time at the Refuge. R. at 5488. These agencies have not found that the Refuge is absolutely safe; rather, the agencies' estimates acknowledge that the levels of radiation present at the Refuge carry an actual, but extremely small, increased risk of cancer. *Id*. In fact, the EPA and CDPHE noted that the risks presented by the contamination levels found in the Refuge are "at the very low end of the CERCLA risk range for excess cancer." R. at 5487. Plaintiffs' evidence, at best, shows that the agencies' findings underestimate the health risks by failing to account for windblown plutonium generally and that trail use will produce some additional windblown dust. But plaintiffs have not, for example, shown that any of their members will be exposed to a risk that exceeds an established threshold for exposure or produces a health risk beyond the very small, but nonetheless non-zero, risk resulting from exposure to even minute quantities of radioactive materials. *See, e.g.*, 40 C.F.R. § 191.03 (standards for radiation exposure established by the Atomic Energy Commission). While it is not necessary for plaintiffs to show that an established

[4] When questioned by the Court about the difference between dirt and dust, and asked about whether the health risk estimates provided by EPA and CDPHE incorporated the risks associated with inhalation of radioactive materials, plaintiffs did not dispute that the EPA and CDPHE's estimates included the health risks associated with inhalation of radioactive material.

standard has been violated to prove irreparable harm, *see Nat'l Ass'n of Farmworkers Organizations v. Marshall*, 628 F.2d 604, 614 (D.C. Cir. 1980) (ordering entry of a preliminary injunction based on a finding of irreparable harm where expert testimony "stressed the insufficiency of current scientific information to assist the setting of safety standards for children exposed to pesticides"), it is insufficient for plaintiffs to merely show that there is no safe level of exposure to plutonium and that the administrative action may increase exposure. Regulatory action often involves managing the levels of risk, and plaintiffs have not shown a basis to claim that agencies are required to eliminate every added risk of plutonium exposure or that such mitigation would even be possible. *See, e.g., Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1345 (D.C. Cir. 1985) ("The Safety Act does not require NHTSA to establish safety standards with an eye toward any conceivable safety hazard, no matter how insignificant; rather, the Act is directed at 'unreasonable' risks. NHTSA could properly conclude that the level of risk here does not rise to such a level." (citiations omitted)); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1100 (9th Cir. 2005), *as amended* (Aug. 17, 2005) ("Rather than criticizing USDA for allowing these risks as a part of its policy, the district court should have evaluated whether there was an adequate basis in the administrative record for USDA's conclusion that the risks were acceptable.").[5] Dr. Ketterer testified that plutonium is present everywhere on

[5] The Supreme Court explained an agency's role in evaluating whether a risk is "significant" in the context of workplace hazards in *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 655 (1980):

> It is the Agency's responsibility to determine, in the first instance, what it considers to be a "significant" risk. Some risks are plainly acceptable and

Earth in varying concentrations due to fallout from nuclear testing. To the extent that plaintiffs argue that increased exposure to plutonium results in per se irreparable harm because there is no safe threshold for exposure, the argument proves too much. *See Corrosion Proof Fittings v. E.P.A.*, 947 F.2d 1201, 1217 (5th Cir. 1991), *opinion clarified* (Nov. 15, 1991) ("Thus it was not enough for the EPA to show . . . that banning some asbestos products might reduce the harm that could occur from the use of these products. If that were the standard, it would be no standard at all, for few indeed are the products that are so safe that a complete ban of them would not make the world still safer."). Accordingly, the Court finds that plaintiffs have failed to meet their burden to show that they will likely suffer irreparable harm in the absence of an injunction. *Winter*, 555 U.S. at 22. Therefore, the Court will deny plaintiffs' motion for a preliminary injunction.

**IV. CONCLUSION**

For the foregoing reasons, it is

**ORDERED** that Plaintiffs' Motion for and Memorandum in Support of Preliminary Injunction [Docket No. 7] is **DENIED**. It is further

**ORDERED** that plaintiffs' third, fourth, fifth, and sixth claims are dismissed

---

others are plainly unacceptable. If, for example, the odds are one in a billion that a person will die from cancer by taking a drink of chlorinated water, the risk clearly could not be considered significant. On the other hand, if the odds are one in a thousand that regular inhalation of gasoline vapors that are 2% benzene will be fatal, a reasonable person might well consider the risk significant and take appropriate steps to decrease or eliminate it. Although the Agency has no duty to calculate the exact probability of harm, it does have an obligation to find that a significant risk is present before it can characterize a place of employment as "unsafe."

without prejudice for lack of subject matter jurisdiction.

DATED August 9, 2018.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge