IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 18-cv-01017-PAB

ROCKY MOUNTAIN PEACE & JUSTICE CENTER,
CANDELAS GLOWS/ROCKY FLATS GLOWS,
ROCKY FLATS RIGHT TO KNOW,
ROCKY FLATS NEIGHBORHOOD ASSOCIATION, and
ENVIRONMENTAL INFORMATION NETWORK (EIN) INC.,

 Plaintiffs,

v.

UNITED STATES FISH AND WILDLIFE SERVICE,
MARTHA WILLIAMS,[1] in her official capacity as Principal Deputy Director, U.S. Fish and Wildlife Service,
DEBRA HAALAND, in her official capacity as Secretary of the Interior,
DAVID LUCAS, in his official capacity as Project Leader, Region 6, U.S. Fish and Wildlife Service,
UNITED STATES FEDERAL HIGHWAY ADMINISTRATION,
STEPHANIE POLLACK, in her official capacity as Acting Administrator of the United States Federal Highway Administration, and
PETER BUTTIGIEG, in his official capacity as Secretary of Transportation,

 Defendants.

---

# ORDER

---

This matter is before the Court on plaintiffs' Complaint for Declaratory and

Injunctive Relief [Docket No. 1] and Plaintiffs' Opening Brief [Docket No. 45]. Plaintiffs

challenge defendants' March 23, 2018 decision to modify the location of certain

---

[1] As public officers who are parties in their official capacity, the Court automatically substitutes Martha Williams, Principal Deputy Director of the United States Fish and Wildlife Service; Debra Haaland, Secretary of the Interior; Stephanie Pollack, Acting Administrator of the Federal Highway Administration; and Peter Buttigieg, Secretary of Transportation, as the successors to Greg Sheehan, Ryan Zinke, Brandye Hendrickson, and Elaine Chao pursuant to Fed. R. Civ. P. 25(d).

planned multi-use trails at the Rocky Flats National Wildlife Refuge (the "Refuge"). Docket No. 45 at 1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

## I.  BACKGROUND[2]

This is an appeal of administrative actions taken by the United States Fish and Wildlife Service (the "FWS") and the United States Federal Highway Administration (the "Highway Administration") that, in the course of opening the Refuge to visitors from the general public beyond guided tours, reroute sections of trails planned for construction in the Refuge.

The Refuge is located in Jefferson County, Colorado on land surrounding the decommissioned nuclear processing facility at Rocky Flats. The so-called "industrial area," where the processing facilities were located, and the land immediately surrounding it are still administered by the United States Department of Energy ("DOE") and are not at issue in this litigation, except insofar as the facility was the source of plutonium contamination affecting the Refuge.

In 2001, Congress passed the Rocky Flats National Wildlife Refuge Act, Pub. L. No. 107-107, 115 Stat. 1012 (2001) (the "Refuge Act"). Congress determined that the "national interest requires that the ongoing cleanup and closure of the entire site be completed safely, effectively, and without unnecessary delay and that the site thereafter

---

[2] The following facts are undisputed unless otherwise indicated. Additional factual background is available in numerous decisions related to Rocky Flats in this district and the Tenth Circuit. *See, e.g., Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1259 (10th Cir. 2002); *Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1098 (D. Colo. 2012), *aff'd sub nom. WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677 (10th Cir. 2015).

be retained by the United States and managed so as to preserve the value of the site for open space and wildlife habitat." *Id*., § 3172(a)(4). Congress also found that the "Rocky Flats site provides habitat for many wildlife species, including a number of threatened and endangered species," and that "[e]stablishing the site as a unit of the National Wildlife Refuge System will promote the preservation and enhancement of those resources for present and future generations." *Id*., § 3172(a)(5).

On September 16, 2004, during the ongoing cleanup efforts at Rocky Flats, the FWS issued the Rocky Flats National Wildlife Refuge Final Comprehensive Conservation Plan and Environmental Impact Statement (the "2004 CCP"). R. at 1327.[3] The 2004 CCP noted that the DOE was responsible for the ongoing cleanup of Rocky Flats, with oversight from the Environmental Protection Agency ("EPA") and the Colorado Department of Public Health and Environment ("CDPHE"). R. at 1361. Upon certification by the EPA that the cleanup was complete, the Rocky Flats site would be divided into two jurisdictions. *Id*. The DOE would retain jurisdiction over the industrial area and its immediate surroundings to "protect cleanup facilities and monitoring systems." *Id*. The FWS would assume responsibility for the other portions of the Rocky Flats site, with these transferred portions forming the Refuge. *Id*. The 2004 CCP contemplated that, following the creation of the Refuge, multi-use trails would be created in the Refuge that would be accessible to the public. *Id*. at 1368 ("Visitor use facilities would include about 16 miles of trails, a seasonally staffed visitor contact station, trailheads with parking, and developed overlooks. . . . Most trails would use

---

[3] The Court cites to the administrative record, Docket No. 26, throughout this order as "R. at __."

existing road corridors.  Public access would be by foot, bicycle, or horse, with limited

car access to two parking areas on the Refuge.").  The 2004 CCP authorized the multi-

use trails through "compatibility determinations," which provided that the use of the

refuge for environmental education, multi-use trails, and wildlife observation and

photography were compatible recreational uses of the Refuge.  *Id*. at 1603-17.

The 2004 CCP stated that the FWS "believe[d] that the health risk from working

on or visiting Refuge lands would be low."  R. at 1363.  Under EPA regulations, "[f]or

known or suspected carcinogens, acceptable exposure levels are generally

concentration levels that represent an excess upper bound lifetime cancer risk to an

individual of between $10^{-4}$ and $10^{-6}$ using information on the relationship between dose

and response."  40 C.F.R. § 300.430(e)(i)(A)(2).  The 2004 CCP anticipated that areas

with soil plutonium concentrations of 7-50 pCi/g would be retained by the DOE while

areas with soil plutonium concentrations below 7 pCi/g would become Refuge lands.[4]

*See* R. at 1362.  It further stated that "the estimated increased cancer risk from

exposure to residual [plutonium] soil contamination of 7 pCi/g is 1 in 1 million for the

Refuge worker, and 0.6 in 1 million (or 6 in 10 million) for the Refuge visitor."  R. at

1363.  These values were calculated based on the added radiation exposure of a

Refuge worker spending "4 hours indoors and 4 hours outside for 250 days a year for

18.7 years" and of a Refuge visitor spending "2.5 hours outside for 100 days a year for

6 years (child) or 24 years (adult)."  *Id*.  The 2004 CCP also noted that "the majority of

_____

[4] The notation "pCi/g" indicates the number of picocuries  of radiation given off by
a gram of sampled material.  *See* R. at 1361.  One picocurie is 1/1,000,000,000,000
(one trillionth) of a curie.  A curie is a standard measure for the intensity of radioactivity
contained in a sample of radioactive material.

the public use facilities would be located in areas where the residual contamination is much lower (less than 1 pCi/g)." *Id*.

On February 16, 2005, the FWS issued a record of decision ("2005 ROD") adopting the 2004 CCP for the Refuge. R. at 1312-26. The 2005 ROD included a map of the approved trail system for the Refuge:



R. at 1319 (trail map from 2005 ROD).

On May 25, 2007, the EPA published a notice in the Federal Register certifying that the portion of the Refuge site that would be transferred to the Department of Interior to form the Refuge "poses no significant threat to public health or the environment and, therefore, no further remedial measures pursuant to CERCLA are appropriate." R. at 5515, National Oil and Hazardous Substances Pollution Contingency Plan; National Priorities List, 72 Fed. Reg. 29276 (May 25, 2007); *see also*

5

R. at 5508 (map of transferred area in letter of transfer to the FWS); R. at 5511 (June 11, 2007 EPA certification letter). "CERCLA" refers to the Comprehensive Environmental Response, Compensation, and Liability Act, commonly known as the "Superfund," enacted on December 11, 1980 and codified at 42 U.S.C. § 9601 *et seq*. *See also* Superfund Amendments and Re-authorization Act, Pub. L. No. 99-499, 100 Stat. 1613 (Oct. 17, 1986). Under this law, the EPA established standards and procedures for cleanup of radioactive materials at Superfund sites like Rocky Flats. *See* 42 U.S.C. § 9602; 40 C.F.R. Ch. I, Subch. J, Pt. 300.

After the Refuge came under the supervision of the FWS in 2007, the FWS acquired additional land at the southwest corner of the Refuge, which had not previously been part of Rocky Flats and which was not subject to prior cleanup efforts. *See* Docket No. 14 at 16; R. at 4. This parcel of land is referred to by the parties as the "Section 16 Parcel" and contains an old coal and clay mine. *Id*.; R. at 1044. Before the land was acquired, the FWS conduced a survey of the area, finding "no known or observable environmental contaminants issues." R. at 1038. The August 11, 2011 survey report did note the presence of debris in the area, including a "rusted storage barrel at the water's edge" near the old mine that "appear[ed] to be empty." R. at 1048. The report recommended removing the barrel and other refuse from the Section 16 Parcel. R. at 1038. In the process of adding the Section 16 Parcel to the Refuge, the FWS issued a "finding of no significant impact" (a "FONSI"), concluding that a supplemental EIS need not be prepared. R. at 1000-04. In reaching that decision, the FWS determined that the proposed action "would pose minimal risk to public health and safety," as "the EPA has designated that the [Section 16 Parcel is] suitable for unlimited

6

use and unrestricted exposure." R. at 1002.

On September 21, 2011, the EPA and CDPHE sent a letter in response to the FWS's questions requesting "additional information regarding residual risk" at the Refuge. The letter stated that the health risks at the Refuge "are within or below the acceptable CERCLA risk range ($10^{-4}$ to $10^{-6}$ risk of excess cancer incidence) and that radiation doses are below State standards." R. at 5487. The letter noted that the average concentrations of radioactive materials was "about 3.2 pCi/g" even in the eastern portion of the Refuge, which is downwind of the industrial area (based on the prevailing winds) and therefore expected to be more contaminated, and that this level is "well below the 9.8 pCi/g that corresponds to a 1 x $10^{-6}$ risk for a [Refuge visitor]."[5] R. at 5488. Based on this testing data, the EPA and CDPHE stated that the "lands comprising the Refuge are suitable for unlimited use and unrestricted exposure." *Id*.

In November 2017, the Highway Administration issued a Scoping Report for construction of trails within the Refuge. Docket No. 7-1. On March 23, 2018, the FWS issued an Environmental Action Statement (the "2018 EAS") to make changes to the 2004 CCP. R. at 1. In doing so, the FWS invoked the categorical exclusions[6] under 40

---

[5] This area is referred to as the "Wind Blown Area." The Wind Blown Area is a portion of the Refuge that, per the 2004 CCP, had a higher pre-cleanup concentration of plutonium in surface soils (between 1-7 pCi/g). *See* R. at 1362, 5493 (map showing Wind Blown Area). This was caused by industrial oil mixed with plutonium leaking into soils between 1958 and 1968. *See id*. at 1455. These soils were subsequently blown by the wind and deposited in the east and southeast portions of the Refuge. *See id*.

[6] A "categorical exclusion" is "a streamlined process allowing minor projects to be quickly implemented so long as they have no significant effect on the environment." *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 735 (10th Cir. 2006). The regulations of the National Environmental Policy Act ("NEPA") define a categorical exclusion as "a category of actions which do not individually or cumulatively have a significant effect on

C.F.R. § 1508.4 allowing for "minor changes in the amounts or types of public use" of public lands "in accordance with existing regulations, management plans, and procedures" as well as categorical exclusions for changes to such plans "when no or minor effects are anticipated." R. at 9. At issue here, the 2018 EAS made changes to the trail routes planned in the 2004 CCP. R. at 7-8. As reflected in the 2018 EAS map attached to this Order as Exhibit A, the FWS changed the Walnut Creek trail in the northeast of the Refuge into a loop, extended the Rock Creek trail on a curving path in the northwest of the Refuge, and extended the Rocky Mountain Greenway Trail to the old mine in the Section 16 Parcel as well as changing its course along the south and east of the Refuge. R. at 7. The change to the eastern part of the Rocky Mountain Greenway is demarcated in a zone that was "not included in [the] determination" because it would not be fully developed in 2018.[7] R. at 6. The 2018 EAS noted that this change would require an additional NEPA determination. *Id*. at 8.

On May 1, 2018, plaintiffs filed their complaint in this case. Docket No. 1. Plaintiffs bring claims for violations of the federal Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*, the National Environmental Policy Act, 42 U.S.C.

---

the human environment . . . and for which, therefore, neither an environmental assessment nor an environmental impact statement is required." 40 C.F.R. § 1508.4 (1978). However, "a proposed action is precluded from categorical exclusion if 'extraordinary circumstances' exist such that 'a normally excluded action may have a significant environmental effect.'" *Utah Envtl. Cong.,* 443 F.3d at 736 (quoting 40 C.F.R. § 1508.4). Crucially, the potential environmental effect must be "significant" before an agency wishing to rely on a categorical exclusion must "engage in further analysis." *Id*. at 742.

[7] A portion of this change is located in the Wind Blown Area. *Compare* R. at 8, *with* R. at 5493.

§ 4331 *et seq.*, the National Wildlife Systems Administration Act (the "Refuge Act"), 16 U.S.C. § 668dd, and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*. On June 27, 2018, defendants filed the administrative record. Docket No. 26.

On May 31, 2018, plaintiffs filed a motion for a preliminary injunction. Docket No. 7. On July 16, 2018, the Court held a hearing on plaintiffs' motion for a preliminary injunction. Docket No. 38. On August 9, 2018, the Court issued an order denying the motion. Docket No. 42. The Court concluded that plaintiffs failed to meet their burden to show that they would likely suffer irreparable harm in the absence of an injunction. *Id*. at 12-17. The Court further concluded that plaintiffs did not have standing to bring their ESA claims, which concerned the habitat for the Preble's Meadow Jumping Mouse ("Preble's mouse") and, accordingly dismissed plaintiffs' third, fourth, fifth, and sixth claims. *Id*. at 9-12.

Following the Court's order on the preliminary injunction, the parties completed briefing on plaintiffs' remaining claims for violations of NEPA (the "NEPA claim") and the NWRSAA (the "Refuge Act claim"). Docket Nos. 45, 49, 52. Plaintiffs filed a motion, Docket No. 43, requesting the addition of eight documents to the administrative record, which the Court denied. Docket No. 48.[8]

---

[8] On September 3, 2019, plaintiffs filed additional "supplemental authority" related to (1) relocation of prairie dogs into the Refuge in 2018 and (2) a soil sampling result from August of 2019 indicating an elevated level of residual plutonium near the Refuge's eastern border. Docket No. 54. Although this filing is not titled as a motion, plaintiffs argue in a footnote that the Court should consider this extra-record evidence. *Id*. at 2-3 n.2. Construing plaintiffs' filing as a motion to supplement the record, the Court will deny the motion. As the Court has already explained, only "extremely limited" circumstances warrant consideration of extra-record materials in reviewing agency decisions. *See* Docket No. 48 at 2; *Am. Mining Cong. v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985). Plaintiffs' explanation of how those extremely limited circumstances

## II. LEGAL STANDARD

### A.   Administrative Procedure Act

Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*,

the Court must determine whether an agency action was "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

The scope of this review is narrow.  *See Colo. Wild, Heartwood v. U.S. Forest Service*,

435 F.3d 1204, 1213 (10th Cir. 2006) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm*

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  "An agency's decision is arbitrary and

capricious if the agency (1) 'entirely failed to consider an important aspect of the

problem,' (2) 'offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise,' (3) 'failed to base its decision on consideration

---

apply here is cursory.  *See* Docket No. 54 at 2-3 n.2.  As to the prairie dogs, the Court is not persuaded that the FWS accepting prairie dogs from offsite in 2018 has any bearing on the trail modifications contained in the 2018 EAS.  And, as to the soil sample, the trail modifications are nowhere near the location of the soil sample. *Compare* R. at 7 (map of trail modifications), *with* Docket No. 54-6 (map showing location of the soil sample).  The approximate location of the elevated soil sample, as provided by plaintiff, is adjacent to the Wind Blown Area.  *See* Docket No. 54-6 (map showing approximate location of elevated soil sample); R. at 5493 (map showing location of Wind Blown Area).  The FWS acknowledges that public trails in the Wind Blown Area would require an additional NEPA determination.  *See* Docket No. 56 at 5; R. at 6-8.  Thus, plaintiffs have not met their burden to show that consideration of the "supplemental authority" they offer is warranted.  Even if the Court supplemented the record with the elevated soil sample, subsequent testing has not substantiated the significance of the test result.  *See* Colorado Department of Public Health and Environment, Hazardous Materials & Waste Management Division, *Review of potential radiation doses during construction of the Jefferson Parkway* 10-11 (June 2020), https://oitco.hylandcloud.com/Pop/docpop/docpop.aspx (stating that 25 additional soil samples were taken as a result of the elevated sample, which showed an average plutonium concentration of 0.856-0.925 pCi/g).

of the relevant factors,' or (4) made 'a clear error of judgment.'"  *New Mexico ex rel.*

*Richardson v. Bureau of Land Management*, 565 F.3d 683, 704 (10th Cir. 2009)

(citation omitted).  When reviewing an agency's factual determinations made as part of

the NEPA process, the Court "ask[s] only whether the agency took a 'hard look' at

information relevant to the decision."  *Id.*

"In addition to requiring a reasoned basis for agency action, the 'arbitrary or

capricious' standard requires an agency's action to be supported by the facts in the

record."  *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994).

An agency's decision, therefore, is arbitrary if not supported by "substantial evidence."

*Id.*  "Evidence is substantial in the APA sense if it is 'enough to justify, if the trial were to

a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact.'"  *Id.*

(citation omitted).

A presumption of validity attaches to the agency action and the burden of proof

rests with the appellants who challenge such action.  *Citizens' Comm. to Save Our*

*Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008).  The deference given to an

agency action "is especially strong where the challenged decisions involve technical or

scientific matters within the agency's area of expertise."  *Utah Envtl. Cong.*, 443 F.3d at

739.

## B.   National Environmental Policy Act

NEPA declares the federal government's policy to "use all practicable means and

measures, including financial and technical assistance . . . to create and maintain

conditions under which man and nature can exist in productive harmony."  42 U.S.C.

§ 4331(a). To that end, NEPA imposes a requirement on federal entities to take a "hard look" at the environmental impact of a proposed action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA was intended to ensure that agencies "consider environmentally significant aspects of a proposed action, and, in so doing, let the public know that the agency's decisionmaking process includes environmental concerns." *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1162 (10th Cir. 2002).

Before an agency may take a "major Federal action[] significantly affecting the quality of the human environment," it must prepare an in-depth environmental impact statement ("EIS"). 42 U.S.C. § 4332(C); *see also Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006). Agencies must begin the NEPA evaluation process as early as possible so that the EIS serves to ensure incorporation of environmental values into the decisionmaking process, instead of rationalizing it after the fact, and to avoid downstream delays. 40 C.F.R. §§ 1501.2, 1502.5 (1978).[9] An EIS is an "action-forcing" device with two primary purposes: (1) to ensure that the decisionmaker "will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) to make information available to the public, which "may also play a role in both the decisionmaking process and the

_____

[9] On September 14, 2020, the Council on Environmental Quality promulgated new NEPA-implementing regulations that supersede the regulations in effect at the time of the agencies' actions. *See* 40 C.F.R. § 1500 *et seq.* In evaluating the legality of the agencies' actions, the Court applies the version of the regulations effective at the time of the actions. That version is published at 43 Fed. Reg. 55,994 (Nov. 29, 1978). All citations to 40 C.F.R. § 1500 *et seq.* in this order are to the old version of the regulations.

implementation of that decision."  *Robertson*, 490 U.S. at 349.  An EIS must address the environmental impact of the proposed action; adverse effects that cannot be avoided; mitigation measures; alternatives to the proposed action, including a no-action alternative; direct, indirect, and cumulative impacts of the proposed action; and any "irreversible and irretrievable commitments of resources" entailed in implementing the proposed action.  42 U.S.C. § 4332;  *see also* 40 C.F.R. § 1508.25; 40 C.F.R. § 1502.14 (1978) (the discussion of alternatives "is the heart of the environmental impact statement" and it "should present the environmental impacts of the proposal and the alternatives," including the "alternative of no action," and the agency must identify its "preferred alternative").

Courts review an agency's NEPA process for abuse of discretion.  *Citizens Against Burlington v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991).  Although NEPA imposes procedural requirements on federal agencies, NEPA does not dictate the substantive results of an agency's analysis.  *See N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (noting that NEPA "merely prohibits uninformed – rather than unwise – agency action").  Thus, "[s]o long as the record demonstrates that the agencies in question followed the NEPA procedures, which require agencies to take a 'hard look' at the environmental consequences of the proposed action, the court will not second-guess the wisdom of the ultimate decision." *Utahns for Better Transp.*, 305 F.3d at 1163 (quoting *Robertson*, 490 U.S. at 350).

### C.   Refuge Act

The Refuge Act, codified at 16 U.S.C. § 668dd *et seq.*, establishes the "National

Wildlife Refuge System" (the "System"), a "national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats," to be administered by the Secretary of the Interior (the "Secretary") through the FWS.  16 U.S.C. §§ 668dd(a)(1)-(2).[10]  The Refuge Act expresses the "policy of the United States" that "compatible wildlife-dependent recreational uses are the priority general public uses of the System."  *Id*. § 668dd(a)(3)(C).  Consequently, "when the Secretary determines that a proposed wildlife-dependent recreational use is a compatible use within a refuge, that activity should be facilitated, subject to such restrictions or regulations as may be necessary, reasonable, and appropriate."  *Id*. § 668dd(a)(3)(D).  In order to "initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge," the Secretary must make a determination "that the use is a compatible use and that the use is not inconsistent with public safety."  *Id*. § 668dd(d)(3)(A)(i).  This is known as a "compatibility determination."  50 C.F.R. § 25.12 ("Compatibility determination means a written determination . . . signifying that a proposed or existing use of a national wildlife refuge is a compatible use or is not a compatible use.").

_____

[10] In 1997, Congress amended the NWRSAA through the National Wildlife Refuge System Improvement Act of 1997.  *See* National Wildlife Refuge System Improvement Act of 1997 ("NWRSIA"), Pub. L. No. 105-57, 111 Stat. 1252-1260 (codified at 16 U.S.C. §§ 668dd–668ee).  Consequently, some courts refer to claims like plaintiffs' as arising under NWRSIA.  *Compare Wyoming v. United States*, 279 F.3d 1214, 1218 (10th Cir. 2002) (using NWRSIA), *with Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130 (D.D.C. 2012) (using NWRSAA).  The Court uses the term "Refuge Act" throughout this order.

## III. ANALYSIS

### A. The NEPA Claim

Plaintiffs claim that the FWS violated NEPA in the 2018 EAS by (1) failing to prepare a supplemental environmental impact statement ("EIS") for the trail modifications and (2) improperly relying on a categorical exclusion rather than conducting an environmental assessment. Docket No. 45 at 21-33. The Court considers each argument in turn.

#### 1. Whether a Supplemental EIS Is Required

An agency must prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Although an initial EIS is often sufficient, it must be supplemented in certain circumstances. *Norton v. S. Ut. Wilderness All.*, 542 U.S. 55, 73 (2004). Those circumstances arise if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c) (1978). "To comply with NEPA, an agency must take a 'hard look' at any new information and assess whether supplementation might be necessary." *Rags Over the Arkansas River, Inc. v. Bureau of Land Mgmt.*, 77 F. Supp. 3d 1038, 1052 (D. Colo. 2015).

The FWS prepared an initial EIS in the 2004 CCP, which contemplated the creation of multi-use trails in the Refuge. *See* R. at 1368. However, the FWS did not prepare a supplemental EIS before issuing the 2018 EAS. *See* R. at 1-11. Plaintiffs

argue that the FWS violated NEPA by failing to take a "hard look" at new information that, if properly examined, would have required the FWS to supplement the EIS in the 2004 CCP. Docket No. 45 at 22. Specifically, plaintiffs argue that the initial EIS, promulgated in 2004, is "too old." *Id*. at 22-23. Plaintiffs also point to four "potentially significant" issues that, in their view, require the preparation of the supplemental EIS: (1) the proposed trail modifications, (2) the addition of the "Section 16 Parcel" to the Refuge, (3) floods that occurred in 2013, and (4) the potential existence of plutonium on the Refuge. *Id*. at 23-28.

As an initial matter, the Court rejects the argument that the EIS in the 2004 CCP is too old to provide reasoned decisionmaking. While an agency may consider the age of an EIS in determining whether to supplement it, plaintiffs point to no requirement that an agency must do so when an EIS reaches a certain age. Rather, the agency must only do so where there are significant new circumstances or information that would bear on the proposed action. *See* 40 C.F.R. § 1502.9(c) (1978). While it follows that an older EIS is more likely to require supplementation because the passage of time is more likely to lead to new circumstances or information, it does not follow that a supplemental EIS is required solely because time has passed. Thus, the question before the Court is whether any of the "potentially significant" changes or circumstances identified by plaintiffs required the preparation of a supplemental EIS.

### a. Segmentation

Plaintiffs' challenge centers around three of the modifications made in the 2018 EAS to the public trails contemplated in the 2004 CCP. Docket No. 45 at 23-24.

Specifically, those changes, all to the Rocky Mountain Greenway, are (1) one mile of the trail that now traverses the Section 16 Parcel in the southwest portion of the Refuge, (2) trail reconfigurations in the Wind Blown Area in the east of the Refuge, and (3) the trail no longer crossing Indiana Street in the northeast corner of the Refuge such that the only planned crossing of Indiana Street leads to the Wind Blown Area. *Id*. Defendants, in response, point out that trail modifications (2) and (3) are not covered by the 2018 EAS because they are not being constructed or opened at this time. Docket No. 49 at 11-12. Defendants acknowledge that some form of supplemental NEPA determination will be required before construction begins on these modifications. *Id*. (citing R. at 6-8).

Plaintiffs contend that the FWS's exclusion of certain areas form its trail modifications is impermissible segmentation of the proposed environmental action. Docket No. 52 at 7-8. In support, plaintiffs rely on 40 C.F.R. § 1508.25(a)(3) (1978), which directs an agency to consider analyzing "[s]imilar actions" in the same impact statement. "Similar actions" are actions that, "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequencies together, such as common timing or geography." *Id*. Agencies "should" consider similar actions in the same impact statement "when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement." *Id*.; *see also Utahns for Better Transp.*, 305 F.3d at 1182-83 (noting that "the rule against segmentation is not required to be applied in every situation").

The Court is not persuaded that the regulation required the FWS to evaluate trail

17

modifications (2) and (3) in the same NEPA determination as trail modification (1). Trail modifications (2) and (3) do not share "common timing or geography" with trail modification (1), as (2) and (3) are not being opened at the same time and do not cross the same area of the Refuge as (1) (the Wind Blown Area in the Refuge's east vs. the Section 16 Parcel in the Refuge's west). *See* 40 C.F.R. § 1508.25(a)(3) (1978). Thus, trail modifications (2) and (3) are not similar actions to trail modification (1) within the meaning of the regulation. Moreover, plaintiffs do not explain why the "best way" for the FWS to assess the impacts of trail modifications (2) and (3) is to consider them in the same impact statement as (1). *See id*. As the agency acknowledged in the 2018 EAS, any future action with regard to modifications (2) and (3) will take place at a later date and require a supplemental NEPA determination. *See* R. at 6-8. It does not appear that adopting the 2018 EAS, including trail modification (1), "foreclose[s] the opportunity" for the FWS "to consider alternatives" to trail modifications (2) and (3) at a later date. *See Utahns for Better Transp.*, 305 F.3d at 1183. Accordingly, the Court disagrees that the agency's approach to the three trail changes is improper segmentation.

### b. Section 16 Parcel

Plaintiffs argue that trail modification (1) – the decision to construct one mile of trail across the Section 16 Parcel – requires the preparation of a supplemental EIS. Docket No. 45 at 24-25. Plaintiffs observe that Section 16 was not previously part of the Refuge and that Section 16 contains an old coal and clay mine. *Id*. at 24. Plaintiffs

suggest that there may be some environmental contamination within the parcel based on the presence of certain debris near the old mine. *Id*. at 24-25.

The Court agrees with defendants that the construction of trail modification (1) over the Section 16 Parcel does not require a supplemental EIS.[11] Before adding the Section 16 Parcel to the Refuge, the FWS conducted an environmental assessment. *See* R. at 1038-55. In that assessment, the FWS "found no known or observable environmental contaminants issues" connected with the Section 16 Parcel. *See id*. at 1038. Next, in the process of adding the Section 16 Parcel to the Refuge, the FWS issued a FONSI,[12] concluding that a supplemental EIS need not be prepared. *See id*. at 1000-04. The FWS determined that the adding the Section 16 Parcel "would pose minimal risk to public health and safety," as "the EPA has designated that the [Section 16 Parcel is] suitable for unlimited use and unrestricted exposure." *See id*. at 1002. Although plaintiffs point out that the Section 16 Parcel was "not subject to prior cleanup efforts," the record indicates that such cleanup efforts were not deemed to be

---

[11] Plaintiffs make a cursory argument that a supplemental EIS is needed for any new trail construction, relying on *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988). *See* Docket No. 45 at 16. That case, however, does not bear the weight plaintiffs place on it. In *Conner*, the Ninth Circuit concluded that an EIS was required prior to the sale of certain types of oil and gas leases because the sale of those leases "entailed an irrevocable commitment of land to significant surface-disturbing activities" which are "likely, if not certain, to significantly affect the environment." *See Conner*, 848 F.2d at 1449-50. Those activities – "drilling, roadbuilding, [and] pipe-laying" – are not similar to use of the land for public trails. *See id*. at 1450. The Court does not read *Conner* to stand for the principle that any trail construction qualifies as a "significant surface-disturbing activity" that would "significantly affect the environment."

[12] A FONSI is a document "briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13 (1978).

necessary.  Because it was not arbitrary or capricious for the FWS to rely on the FONSI determination, plaintiffs have not identified any "significant new circumstances or information relevant to environmental concerns" connected to trail modification (1) that the FWS needed to consider before adopting the 2018 EAS.  *See* 40 C.F.R. § 1502.9(c) (1978).

### c.  Erosion

Plaintiffs argue that a supplemental EIS should have been prepared as a result of flooding that occurred in the Refuge in 2013.  Docket No. 45 at 25-26.  The record indicates that up to 13.25 inches of rain fell in or near the Refuge between September 8 and 13, 2013.  R. at 386.  Plaintiffs posit that such flooding could contribute to erosion which could, in turn, lead to buried plutonium in the Refuge being brought to the surface.  Docket No. 45 at 26.  The Court construes this as an argument that the floods are "significant new circumstances or information relevant to environmental concerns." *See* 40 C.F.R. § 1502.9(c) (1978).

In the 2004 CCP, the FWS carefully considered the presence of plutonium in the soil on both the Refuge and the industrial area, which remains under DOE's administration.  As to the Refuge, the FWS determined that "[e]xisting concentrations of plutonium . . . are very low (less than 7 pCi/g) in the surface soils," with most soil having a concentration less than 1 pCi/g.  *See* R. at 1455, 1362 (map of plutonium concentrations in surface soils); *see also id*. at 5488 (EPA's 2011 determination that the average plutonium concentration in the Refuge was 1.09 pCi/g) .  Notably, the record indicates that elevated plutonium concentrations "are limited to surface soils" on the

Refuge, both because of certain environmental characteristics of plutonium and the method of distribution across the Refuge (wind). *See* R. at 1455.

The Court is not persuaded that the FWS violated NEPA by not promulgating a supplemental EIS on the basis of potential erosion from the 2013 floods. The record indicates that erosion on Refuge land would not lead to increased concentrations of plutonium in surface soils because the surface soils already have higher concentrations of plutonium than the subsurface soils that would potentially be uncovered by floods. Thus, the regular occurrence of weather events on the site that would cause erosion would not alter the underlying determination made by the FWS that the concentrations of plutonium on the Refuge present a low health risk. *See* R. at 1363. Plaintiffs' speculation that the floods may have contributed to erosion that would damage "the integrity of the containment of the buried plutonium" in the industrial area retained by DOE, *see* Docket No. 45 at 26, is not supported by any evidence in the record. *See* R. at 388-89 (flooding report noting that "erosion controls were in acceptable condition," "[n]o locations appear to have suffered severe structural damage," and "[l]ocal erosion" was "minimal"). Without some evidence in the record that the 2013 floods actually did any damage that could lead to buried plutonium breaking containment, it was not a NEPA violation for the FWS to not prepare a supplemental EIS before issuing the 2018 EAS.

### d. Plutonium

Finally, plaintiffs argue that the level of residual plutonium in the Wind Blown Area is a significant new circumstance that would require a supplemental EIS. Docket

No. 45 at 26-28.  As the Court has already discussed, no trail construction is occurring in the Wind Blown Area as a result of the EAS.  In the 2018 EAS, the FWS acknowledges that public trails in the Wind Blown Area would require an additional NEPA determination.  *See* R. at 6-8.  As a result, the 2018 EAS did not approve the construction of trails in the Wind Blown Area.  Defendants did not violate NEPA by failing to consider environmental consequences of federal action in an area where no federal action has been approved.  As to the presence of residual plutonium generally, the FWS considered this in the 2004 CCP, which approved the use of the Refuge for multi-use trails.  *See* R. at 1362-63 (residual plutonium analysis) and 1607-17 (compatibility determinations).  The Court is not persuaded that NEPA required the FWS to redo that analysis before issuing the 2018 EAS, particularly given the EPA's 2011 determination that "[t]he lands comprising the Refuge are suitable for unlimited use and unrestricted exposure."  *See* R. at 5488.

Because plaintiffs have not identified "substantial changes in the proposed action that are relevant to environmental concerns" or "significant new circumstances or information . . . bearing on the proposed action or its impacts," *see* 40 C.F.R. § 1502.9(c) (1978), the Court concludes that the FWS did not violate NEPA by not completing a supplemental EIS before issuing the 2018 EAS.

### 2. *Whether the Agency May Rely on a Categorical Exclusion*

#### a. **Framework**

The FWS issued the 2018 EAS pursuant to a "categorical exclusion," which is "a streamlined process allowing minor projects to be quickly implemented so long as they

have no significant effect on the environment." *Utah Envtl. Cong.*, 443 F.3d at 735.

"Once an agency establishes categorical exclusions, its decision to classify a proposed action as falling within a particular categorical exclusion will be set aside only if a court determines that the decision was arbitrary and capricious." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1023 (10th Cir. 2002). "When reviewing an agency's interpretation and application of its categorical exclusions under the arbitrary and capricious standard, courts are deferential." *Id*.

The Department of the Interior has promulgated a list of actions that qualify as categorical exclusions across the department. *See* 43 C.F.R. § 46.210. In addition, each agency within DOI has promulgated categorical exclusions, which are found in the agency's Departmental Manual ("DM"). The FWS's categorical exclusions are found at 516 DM 8.5. In addition, DOI has promulgated a list of criteria that qualify as extraordinary circumstances for actions that would otherwise be covered by a categorical exclusion. *See* 43 C.F.R. § 46.215.

Here, the FWS determined that the trail modifications in the 2018 EAS fall within three categorical exclusions: (1) "minor changes in the amounts or types of public use on Service or State-managed lands, in accordance with existing regulations, management plans, and procedures," (2) "minor changes in existing master plans, comprehensive conservation plans, or operations, when no or minor effects are anticipated," and (3) "new or revised site, unit, or activity-specific management plans for public use, land use, or other management activities when only minor changes are planned." *See* R. at 1 (citing 516 DM 8.5(B)(7), (9), (10)). The FWS considered each

of the possible extraordinary circumstances that would preclude use of a categorical exclusion and, without elaboration, concluded that none of them would apply to the proposed action. *See id*. at 9. Plaintiffs challenge the FWS's reliance on these categorical exclusions, arguing that there are at least six "extraordinary circumstances" which may apply to the 2018 EAS. Docket No. 45 at 29-33. [13]

As an initial matter, the Court clarifies the scope of the agency action under review. Plaintiffs characterize the agency action at issue as the opening of the Refuge to public trails. *Id*. But that characterization of what the FWS did in the 2018 EAS is too broad. The 2018 EAS states that the proposed action is "[m]inor adjustments to the management direction and strategies found in the [2004 CCP] as necessary to better implement wildlife-dependent recreational opportunities." *See* R. at 8. This action follows from and builds upon the 2004 CCP and 2005 ROD, a distinct agency action that, among other things, approved the development and use of a multi-use trail system at the Refuge. Indeed, the 2018 EAS assumes that the FWS "will begin steps to allow larger numbers of visitors to enjoy the Refuge," which is consistent with the 2004 CCP. *See* R. at 5. It makes little sense to characterize the agency action in the 2018 EAS as "opening trails to the public" when the decision to open trails to the public was made over a decade before the 2018 EAS. *See* R. at 1318 (adopting use plan for the refuge that included "12.8 miles of multi-use trail [and] 3.8 miles of hiking-only trail"), R. at 1319 (adopting visitor use map of the Refuge, including trails). Moreover, it would

---

[13] The Court does not understand plaintiffs to argue that, notwithstanding the presence of any extraordinary circumstances, the trail modifications do not fit within any of the three categorical exclusions.

defeat at least one purpose of a categorical exclusion – "avoiding unnecessary analysis" – to require the FWS to revisit the already-approved decision to use the Refuge for public trails just to make modifications to the trail map. *See Utah Evtl. Cong.*, 443 F.3d at 742. Accordingly, the Court's analysis focuses on whether there are extraordinary circumstances that would apply to the trail modifications,[14] not whether extraordinary circumstances apply to the multi-use trails system as a whole.

Plaintiffs argue that the FWS's determination that no extraordinary circumstances existed is arbitrary and capricious because the record contains no "analysis" of each potential extraordinary circumstance. Docket No. 45 at 28. The 2018 EAS contains a table of each possible extraordinary circumstance that would preclude use of a categorical exclusion. R. at 9-10. Each extraordinary circumstance is marked "no," save for one footnote as to "public controversy" indicating that the FWS "does not expect there to be actual controversy over potential environmental impacts" of the trail modifications. *Id*. at 10 n.3.

The Court rejects this argument. The regulations require the agency merely to "evaluate[]" an action that is normally categorically excluded "to determine whether it meets any of the extraordinary circumstances." *See* 43 C.F.R. § 46.205(c)(1). Only if it does is the agency required to conduct "further analysis." *Id*. Reading the regulation to require detailed written analysis from the agency before rejecting each extraordinary circumstance would seem to defeat the purpose of a categorical exclusion – "a streamlined process allowing minor projects to be quickly implemented" – and fly in the

---

[14] Additionally, for the reasons discussed earlier in this order, the Court does not consider those trail modifications that enter the Wind Blown Area.

face of Tenth Circuit precedent that an environmental effect must be "significant" before an agency wishing to rely on a categorical exclusion must "engage in further analysis." *See Utah Evtl. Cong.*, 443 F.3d at 735, 742. Moreover, NEPA's "rule of reason" standard requires claimed NEPA violations to be more than "merely flyspecks." *Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 852 (10th Cir. 2019). Thus, if the Court's review of the record determines that it was not arbitrary or capricious to reject the application of each extraordinary circumstance, the failure to provide a detailed explanation in the 2018 EAS is, at most, a "flyspeck" that does not violate NEPA.

Plaintiffs attempt to support their argument that an agency's evaluation of extraordinary circumstances must contain contemporary written analysis with non-binding authority from the Ninth Circuit. *See* Docket No. 45 at 28-29. Those cases do not support plaintiffs' position. In *California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2012), the Ninth Circuit held that "the agency must . . . explain why the action does not fall within one of the exceptions" only when "there is substantial evidence in the record that exceptions to the categorical exclusion may apply." Similarly, in *California ex rel. Lockyer v. U.S. Dep't of Ag.*, 575 F.3d 999, 1017-18 (9th Cir. 2009), the Ninth Circuit concluded that a cursory statement that extraordinary circumstances did not apply violated NEPA because the record indicated that there was substantial evidence that one or more exceptions may apply. Thus, these cases indicate that the agency's failure to explain why an extraordinary circumstance does not apply is only arbitrary and capricious if substantial evidence in the record indicates that exceptions to the

categorical exclusion may apply.  As noted below, such substantial evidence is not found in this record.

### b.    Possible Extraordinary Circumstances

Plaintiffs identify at least six possible extraordinary circumstances that, in their view, would preclude the use of a categorical exclusion for the trail modifications.

First, plaintiffs argue that extraordinary circumstances exist because the 2018 EAS has "significant impacts on public health or safety."  Docket No. 45 at 30-31 (citing 43 C.F.R. § 46.215(a)).  However, the agency's record of decision shows no evidence that the multi-use trails system in the Refuge – let alone the trail modifications – would have a significant impact on public health or safety.  As discussed, in the 2004 CCP determined that "the health risk from working on or visiting Refuge lands would be low." *See* R. at 1362-63 (estimating increased cancer risk for an adult Refuge visitor as up to 6 in 10 million for a Refuge visitor who spent 2.5 hours at the Refuge, 100 days a year, for 24 years).  Similarly, when the FWS added the Section 16 Parcel to the Refuge, it determined that the Section 16 Parcel "would pose minimal risk to public health and safety," as it is "suitable for unlimited use and unrestricted exposure."  *See id*. at 1002.

Plaintiffs, who claim that it is "beyond dispute" that there are significant impacts on public health or safety from the trail modifications, point to *Cook v. Rockwell International Corp.*, 580 F. Supp. 2d 1071 (D. Colo. 2006), for support.  In *Cook*, a group of plaintiffs who owned property to the east of what is now the Refuge sued the former operators of the nuclear processing plant at the site, claiming that defendants' "trespass and nuisance" diminished the value of plaintiffs' properties.  *Cook*, 580 F.

Supp. 2d at 1079. The court ruled on the parties' motions to exclude testimony under Federal Rule of Evidence 702 and motions in limine. One such ruling was to the admissibility of evidence of "material unaccounted for" – "plutonium, uranium and other radioactive materials that cannot be accounted for by plant operators." *Id*. at 1145. The court noted that "[i]t is undisputed that the cumulative [material unaccounted for] during [d]efendants' operation of [the plant] is more than 2,600 pounds." *Id*. A jury later found that, on or before January 30, 1990, the defendants' trespass or nuisance "would continue indefinitely." *Cook v. Rockwell Intern. Corp.*, 564 F. Supp. 2d 1189, 1205 (D. Colo. 2008), *rev'd*, 618 F.3d 1127 (10th Cir. 2010).

The problem with plaintiffs' argument is that "[j]udicial review of an agency decision is generally limited to review of the administrative record." *Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1027 n.1 (10th Cir. 2001) (citing *Fed. Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976)). The record in front of the *Cook* court was not the same as the record in front of the agency here, and the Court has already rejected one attempt by plaintiffs to add materials from the *Cook* case to the administrative record. *See* Docket No. 48 at 5 (finding that "plaintiffs have not carried their burden to show that the documents that they seek to add to the record are necessary for review of the administrative action"). Thus, documents from the *Cook* case are not relevant to the question before the Court: whether, based on the record before the agency, the decision to rely on a categorical exclusion in promulgating the 2018 EAS was arbitrary and capricious.[15] Because the record before

---

[15] Even assuming that the *Cook* materials were properly before FWS, the Court is not persuaded that they would bind the agency as strictly as plaintiffs would like. As

the agency contains no evidence that the trail modifications have a significant effect on public health or safety, plaintiffs' first argument fails.

Second, plaintiffs argue that the trail modifications will have "highly controversial environmental effects." Docket No. 45 at 22 (citing 43 C.F.R. § 46.215(c)). "A proposed action is highly controversial if there is a substantial dispute about the size, nature, or effect of the major Federal action; mere opposition to a use is not sufficient." *See Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087, 1120 (D. Colo. 2012) (cleaned up). Here, as in *Town of Superior*,[16] the record does not establish that the trail modifications would have any highly controversial environmental impact. *See id*. Plaintiffs point to no evidence in the record showing a substantial dispute over the size, nature, or effect of the trail modifications, and plaintiffs' disagreement with the FWS's determination "falls short of establishing that the decisions are highly controversial." *See Oregon Nat. Desert Ass'n v. Cain*, 17 F. Supp. 3d 1037, 1058 (D.

_____

the Court has already noted, the *Cook* case "relate[s] to contamination found outside of the Refuge, not in the central operable unit." *See* Docket No. 48 at 4. Thus, it is not clear that the *Cook* materials have any bearing on the multi-use trail system, which is within the central operable unit. And, considering the considerable cleanup efforts undertaken at the Refuge site, it is not clear how instructive a jury finding regarding conditions as of January 1, 1990 would be to current conditions at the Refuge. *See, e.g.*, R. at 5511-12 (2007 letter from the EPA certifying completion of cleanup efforts at Rocky Flats).

[16] Although *Town of Superior* and the cases it cites discuss the meaning of "highly controversial" within the meaning of the former 40 C.F.R. § 1508.27(b)(4), the Court presumes that the phrase carries the same meaning in the companion regulation, 43 C.F.R. § 46.215(c). *See United States v. Castleman*, 572 U.S. 157, 174 (2014) (Scalia, J., concurring in part) ("[T]he presumption of consistent usage [is] the rule of thumb that a term generally means the same thing each time it is used."); *see also Oregon Nat. Desert Ass'n*, 17 F. Supp. 3d at 1057 (applying the same meaning to "highly controversial" in both regulations).

Or. 2014); *see also Town of Superior*, 913 F. Supp. 2d at 1124 ("Public opposition on

its own . . . does not make an issue controversial under NEPA.").

Third, citing to two separate possible extraordinary circumstances, plaintiffs posit

that the trail modifications may "[h]ave significant impacts on . . . refuge lands" or may

"[h]ave highly uncertain and potentially significant environmental effects or involve

unique or unknown environmental risks." Docket No. 45 at 32 (citing 43 C.F.R.

§ 46.215(b) and (d)). The only potential "significant impact" identified in plaintiffs' brief

is that the trails, as modified, will be near residual plutonium. *Id.* As discussed, the

agency determined that any residual plutonium on the site presents a low health risk for

visitors to the Refuge, *see* R. at 1362-63, and that the Section 16 Parcel was suitable

for unlimited use and unrestricted exposure. *See id.* at 1002. In light of this information

in the record, it was not unreasonable for the FWS to determine that neither of these

extraordinary circumstances applied to the trail modifications.

Fourth, plaintiffs argue that the trail modifications "[e]stablish a precedent for

future action or represent a decision in principle about future actions with potentially

significant environmental effects." Docket No. 45 at 32. Plaintiffs argue that the 2018

EAS is a precedent for future action, as they claim it demonstrates that the FWS will

continue to rely on the "outdated" 2004 CCP. *Id.* This argument fails. As the Court has

discussed, the 2004 CCP is not outdated, and it is not arbitrary or capricious to rely on

a planning document that is supposed to last for 15 years when making decisions

consistent with that document within the 15 year time-frame. *See* 16 U.S.C.

§ 668dd(e)(1)(A)(iv) (requiring a CCP to be revised every 15 years "as may be

necessary"). Essentially, plaintiffs' position is that the FWS could never rely on a categorical exclusion once a refuge's CCP reaches a certain age, even before the CCP's statutory expiration date. This position makes little sense. Accordingly, the Court concludes that this possible extraordinary circumstance does not apply.

Fifth, plaintiffs argue that the trail modifications may have a "significant impact" on the Preble's mouse and/or its habitat. Docket No. 45 at 33 (citing 43 C.F.R. § 46.215(h)); *see also* R. at 2741 (map of Preble's mouse critical habitat). The FWS considered this concern, both in the 2004 CCP and before issuing the 2018 EAS. The 2004 CCP indicates that the development of a public trail system was deemed compatible with protection of the Preble's mouse's habitat. *See, e.g.*, R. at 1368, 1376 (discussing plans to monitor impacts of recreational use on the Preble's mouse), 1610-17 (compatibility determination discussing management of trails in Preble's mouse habitat). As to the 2018 CCP, the FWS determined in an intra-service consultation form dated March 23, 2018 that any impacts from the trail modifications are "not likely to destroy or adversely modify designated critical habitat for the Preble's mouse" and that any off-trail use "is considered temporary and not likely to adversely effect the Preble's mouse or its habitat." *See* R. at 2264. Thus, there was no basis for the FWS to conclude that the trail modifications would have a significant impact on the Preble's mouse or its habitat, and it was not arbitrary or capricious to determine that this extraordinary circumstance did not apply.

Finally, citing to 46.215(i), plaintiffs argue that the trail modifications violate federal law – specifically, the Refuge Act, 16 U.S.C. § 668dd *et seq.* – because there is no applicable compatible use determination allowing the modifications. Docket No. 45

at 33.  However, as the Court discusses in the next section, neither the trail

modifications nor the more general use of the Refuge for public trails violate the Refuge

Act.  Thus, it was not arbitrary and capricious for the FWS to determine that this

extraordinary circumstance did not apply.

In summary, because plaintiffs have not shown that the FWS's (1) decision not

to complete a supplemental EIS or (2) reliance on a categorical exclusion was arbitrary

or capricious, the Court concludes that the FWS did not violate NEPA in promulgating

the 2018 EAS.

### B.   The Refuge Act Claim

Plaintiffs claim that the FWS's decision to use the Refuge for public trails violated

the Refuge Act.  Docket No. 1 at 31-32, ¶¶ 100-105.  Specifically, plaintiffs argue that

(1) there is no compatibility determination ("CD") permitting the use of the Refuge for

public trails at all, and (2) the trail modifications outlined in the 2018 EAS are a

"significant change" to the public trails envisioned in the 2004 CCP.  Docket No. 45 at

18-21.

First, the Court considers whether there is an active CD that authorizes the

FWS's action.  The 2004 CCP includes four CDs.  R. at 1603-17.  As relevant here, the

CDs approve the use of the Refuge for (1) interpretation and environmental education,

*id*. at 1607-09 (the "education CD"), (2) multi-use trails, *id*. at 1610-13 (the "trails CD"),

and (3) wildlife observation and photography, *id*. at 1614-17 (the "wildlife observation

CD").  The parties agree that the trails CD cannot support the 2018 EAS because the

trails CD, by its own terms, expired in 2014.  *See id*. at 1613 ("The Compatibility

Determination for this use is subject to mandatory re-evaluation in 10 years . . . in 2014.").

In the 2018 EAS, the FWS cited the education CD and wildlife observation CD as "current compatibility determinations" covering the proposed agency action. *See* R. at 8 n.2. The education CD contemplates "[i]nterpretation programs and facilities . . . along designated trails." *Id.* at 1607. Similarly, the wildlife education CD contemplates programs "along an established and well delineated system of authorized trails designated in the [2004 CCP]," including "16.5 miles of trail" that will be "developed and open." *Id.* at 1614. Because these CDs are "wildlife-dependent," they must be re-evaluated "at least every 15 years." 50 C.F.R. § 25.21(f).[17]

Plaintiffs argue that it was arbitrary and capricious for the FWS to rely on these CDs in opening public trails at the Refuge. The Court disagrees. The two existing CDs both authorize the use of the Refuge for environmental education and wildlife observation. The CDs also expressly contemplate a trail system to support that use. *See* R. at 1614 (wildlife education to occur "along an established and well delineated system of authorized trails"). Because these CDs independently authorize public trails at the Refuge, it was not arbitrary or capricious for the FWS to rely on them rather than the expired trails CD. *See* 16 U.S.C. § 668dd(a)(3)(D) (when it is determined that "a proposed wildlife-dependent recreational use is a compatible use within a refuge, that

---

[17] Plaintiffs do not argue that there are circumstances which would require these CDs to be re-evaluated earlier, such as "conditions under which the use is permitted change[d] significantly," "there is significant new information regarding the effects of the use," or a comprehensive conservation plan is being prepared or revised. *See* 50 C.F.R. § 25.21(f).

activity should be facilitated").  Although the trails CD may be a more explicit or detailed compatibility determination, plaintiffs cite no statute or regulation requiring the agencies to rely only on the most on-point CD when there are other CDs covering the use.

The next question is whether the FWS could modify the planned public trail map without obtaining a new compatibility determination.  Neither the applicable regulation, 50 C.F.R. § 25.21(f), nor the wildlife education CD requires the FWS to re-evaluate the compatible use before approving trail modifications.  Instead, the wildlife education CD states that "facilities not prescribed in the CCP must be approved through an additional public planning process, in compliance with NEPA, Section 7 of the Endangered Species Act, and other environmental compliance requirements."  R. at 1616. Assuming the trail modifications are "facilities not prescribed in the CCP," the Court finds that the FWS followed the prescribed process.  As already discussed, the FWS complied with NEPA in issuing the 2018 EAS, and there is no argument from plaintiffs as to what additional "environmental compliance requirements" the FWS should have engaged in before approving the trail modifications.  Thus, the Court concludes that the FWS's reliance on the wildlife education CD in approving the trail modifications in the 2018 EAS did not violate the Refuge Act.[18]

## IV.  CONCLUSION

The question before the Court in this case is a narrow one: whether the Fish and Wildlife Service followed the proper procedural processes in approving limited

---

[18] Even if the Court determined that the trail modifications were arbitrary and capricious, it appears that plaintiffs' remedy would be, at most, closure of the modified portions of the trails, not closure of all the public trails in the Refuge, as they request. *See* Docket No. 45 at 21.

modifications to the planned multi-use trail system in Rocky Flats National Wildlife Refuge. The answer is that it did follow those processes.

Although plaintiffs sincerely believe that the FWS allowing any public access to the Refuge is unwise, it is not the Court's role to review the wisdom of an agency's decision. *See Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1905 (2020) ("Under [the APA's] narrow standard of review, a court is not to substitute its judgment for that of the agency."); *N.M. ex rel. Richardson*, 565 F.3d at 704 (noting that NEPA "merely prohibits uninformed – rather than unwise – agency action"). As Judge Krieger explained in another NEPA case,

> [t]he fact that reasonable people might have reached a different decision than did the agency is not a basis to overturn a decision that is otherwise procedurally proper. . . . Although public input with regard to [agency] decisions is often sought and considered by agencies, that a significant, large, or even overwhelming portion of the public disagrees with an agency's decision is not a basis for overturning it. If an agency properly follows required procedures, but reaches an unpopular decision, the public's remedy is not found in a court challenge, but instead through the political process.

*Colorado Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1243 (D. Colo. 2012).

For the foregoing reasons, it is

**ORDERED** that Plaintiff's Supplemental Authority [Docket No. 54], construed as a motion to supplement the record, is **DENIED**. It is further

**ORDERED** that Plaintiffs' Motion for In-Person Status Conference [Docket No. 58] is **DENIED**. It is further

**ORDERED** that the Agencies' decisions are **AFFIRMED**, judgment shall enter in favor of defendants, and this case shall be closed in its entirety.

DATED July 9, 2021.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge